## MILK WAGON DRIVERS' UNION, LOCAL NO. 753 ET AL. *v.* LAKE VALLEY FARM PRODUCTS, INC. ET AL.

No. 20.   Argued October 21, 22, 1940.—Decided November 18, 1940.

*Mr. Abraham W. Brussell,* with whom *Mr. David A. Riskind* was on the brief, for petitioners.

*Mr. Arthur R. Seelig* for respondents.

MR. JUSTICE BLACK delivered the opinion of the Court.

This proceeding presents two questions: First, Does there here exist a "labor dispute" within the meaning of the Norris-LaGuardia Act?[1] Second, If there is a "labor dispute," must the jurisdictional prerequisites of the Norris-LaGuardia Act[2] be complied with before injunc-

---

[1] 29 U. S. C. §§ 101–115, 47 Stat. 70. The Act defines a labor dispute as follows: "The term 'labor dispute' includes any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether or not the disputants stand in the proximate relation of employer and employee." 29 U. S. C. § 113 (c), 47 Stat. 73.

[2] "No court of the United States, as herein defined, shall have jurisdiction to issue any restraining order or temporary or permanent injunction in a case involving or growing out of a labor dispute, except in a strict conformity with the provisions of this Act . . ." 29 U. S. C. § 101, 47 Stat. 70.

tive process can be used against a labor union accused of violating the Sherman Anti-Trust Act? [3]

The District Court found that this was a case "involving or growing out of a labor dispute"; that plaintiffs (respondents here) had failed to satisfy the prerequisites of the Norris-LaGuardia Act; and that, accordingly, the court was without jurisdiction to grant either a temporary or a permanent injunction. The Circuit Court of Appeals reversed, one judge dissenting; [4] it was the opinion of that court that the case did not grow out of a labor dispute, and that even if it had, a federal court would have jurisdiction to enjoin if the Sherman Act had been violated.[5] Because of the importance of these questions, we granted certiorari.[6]

The Norris-LaGuardia Act applies to labor disputes between "persons who are engaged in the same industry, trade, craft or occupation; or have direct or indirect interests herein." [7] Here, all of the parties have "direct or indirect interests" in the production, processing, sale, and distribution of milk. Plaintiffs, who sought the injunction, were four: one was the Chicago local of a C. I. O. union, the Amalgamated Dairy Workers; two were Chicago dairies whose milk was processed and distributed by members of the C. I. O. union; [8] the fourth was a

---

[3] 15 U. S. C. §§ 1–7, 26 Stat. 209, as amended. Section 1 provides: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal."

[4] 108 F. 2d 436.

[5] There is no diversity of citizenship, and federal jurisdiction, if present at all, exists because of violation of the Sherman Act. The contention that interstate commerce is involved stems from the fact that defendants, in Chicago, picketed retail stores selling milk produced in Wisconsin. In the view we take of the case, we find it unnecessary to pass on this question.

[6] 309 U. S. 649.

[7] 29 U. S. C. § 113 (a), 47 Stat. 73.

[8] As to one of these plaintiff dairies, the complaint was voluntarily dismissed.

Wisconsin coöperative association which supplied milk. to the plaintiff dairies. Defendants were the Chicago local of the A. F. of L. Milk Wagon Drivers' Union, and its officials. The defendant union is a craft organization, limiting its membership to milk wagon drivers; the plaintiff union is organized along industrial lines, and its membership consists of all kinds of dairy workers, including inside help, office workers, wagon drivers, helpers, sweepers and janitors.

A brief statement as to the background of the controversy is necessary for a better understanding of the issues. The Chicago local of the A. F. of L. Milk Wagon Drivers' Union was organized in 1902. Since the organization, working conditions of the members have been materially improved; hours have been shortened, wages have been raised, and vacation periods with full pay have. been secured. These better terms and conditions of employment have moved concurrently with a more or less steady increase in union membership and influence. At the time this litigation was begun the union had more than five thousand members.

With the approach and continuance of the depression of the early Thirties, the milk business, like other industries, was in acute distress. Loss of profits from decreased demand stimulated dairies to devise new and cheaper methods to obtain and serve customers. Under the long existing practice in Chicago, dairies had owned milk trucks and wagons, and had operated them with employee drivers—chiefly members of the A. F. of L. local. A major part of the business consisted of door-to-door deliveries to retail customers. Some of the A. F. of L. drivers also delivered milk to retail stores, those stores in turn selling to their customers. What appears to have been an insignificant part of the milk supply of pre-depression Chicago was delivered by retail milk "peddlers" who bought from the dairy at wholesale and sold at retail from their own trucks or wagons.

But with the depression this practice of sale by "peddlers" expanded, branched out into sales to retail stores, and developed into what is called the "vendor system"— around which revolves the present controversy. Retail peddling started the controversy; at the root of the conflict, however, is this later emerging "vendor system," under which "vendors" delivered milk at wholesale to retail stores. Under this system, plaintiff dairies make daily sales of milk to individuals owning their own trucks. These individuals, called "vendors," resell the milk to retail stores. Unsold milk is no loss to the "vendor," because the dairy takes it back at the full purchase price.

With the spread of this new competitive system, the business of the dairies employing union milk wagon drivers decreased. Many of the union drivers lost their jobs and were dependent upon their union's relief funds and upon public relief agencies for their support. How many of those who lost their jobs became unemployed as the result of the depression and how many were displaced by the growth of the "vendor system" cannot be determined; both causes undoubtedly contributed.

The stores buying milk from plaintiff dairies through these vendors made a practice of selling it below the standard prices charged for milk supplied by dairies employing A. F. of L. drivers. Defendant union and its members claimed that the reason the price could be cut was that the vendors worked long hours, under unfavorable working conditions, without vacations, and with very low earnings. On the other hand, the vendors and the dairies utilizing their services asserted that the reason for the lower prices was that the vendor system was more economical, that under it more milk could be delivered by wholesale to the cash and carry cut-rate stores, and that such distribution cost less even on the same wage level than did door-to-door distribution. As the vendor system made increasing inroads on the business of the union dairies, the opposition of the defendant union became

more active. Its members insisted that the vendor system constituted unfair competition, depressing labor standards. To combat it, they attempted—as the District Court found from the facts—to unionize the employees and vendors of the dairies utilizing this plan. Not succeeding in this attempt, in 1934 they began picketing the so-called cut-rate stores. The picketing was carried on almost continuously until this suit was filed. Pickets usually carried placards denouncing cut-rate stores as unfair to the A. F. of L. local. During the years in which this strife continued, store windows were broken, personal altercations occurred, charges and countercharges were frequent, arrests were made and court proceedings instituted. Finally, in March, 1938—about two months before the complaint was filed in this case—the vendors and the other employees of the plaintiff dairies organized the plaintiff union under a C. I. O. charter. Thereupon signs were placed inside the cut-rate store windows, announcing that the milk handled by the stores was processed and delivered by members of the plaintiff union. But this did not settle the long-standing controversy; the picketing continued, and this suit followed.

The petition for an injunction rests primarily upon the charge that the defendant union and its officials had entered into a conspiracy to interfere with and restrain interstate commerce in violation of the Sherman and Clayton Acts. It is contended by plaintiffs that the controversy is not a labor dispute within the meaning of the Norris-LaGuardia Act, but is an unlawful secondary boycott of which the purpose is not to unionize the vendors but to obtain for the defendants' employers a Chicago milk monopoly at a sustained high price level, contrary to the Sherman Act.

*First.* The complaint on its face is probably sufficient to show that a labor dispute existed.[9] We need not decide

---

[9] Among other things, the complaint revealed that the vendors were members of the C. I. O. union which had made a contract touching on

that point, however, for the case proceeded to final judg-
ment. Defendants filed an answer, and the court referred
plaintiffs' motion for a temporary injunction to a special
master. The master conducted extensive hearings, and
heard evidence offered by both sides. In his report, the
master found, in the language of the Norris-LaGuardia
Act, that the case arose out of and involved a labor "dis-
pute between one or more employers or associations of
employers and one or more employees or associations of
employees," all of whom were engaged in the same in-
dustry, trade, craft or occupation, namely, the milk in-
dustry; that defendants had attempted for some time to
unionize the employees of the plaintiff dairies and of
other cut-rate dairies, and that the picketing was an effort
on the part of the defendants to compel the vendors and
wagon drivers of the dairies to join the defendant union
for the purpose of improving working conditions and
wages of vendors; that the working hours of the plaintiff
dairies' employees were longer and the wage scales lower
than the union standards.[10] The District Court adopted
the findings of the master, and made further findings of
its own.

the terms and conditions of employment with the plaintiff dairies,
that the vendors' right of organization and collective representation
for the purpose of avoiding industrial strife with the defendant union
should be protected, and that the plaintiff union and the defendant
union were in actual competition in obtaining employment in connec-
tion with the sale and distribution of milk in the City of Chicago.

[10] Plaintiffs complain of the form in which this last finding was made.
Undoubtedly, the Master failed to use apt language in expressing
his conclusions. But the language used, read in its context and in
conjunction with the entire record, reveals that the objections to the
finding are without foundation. What the Master said in his report
was: "The Master is of the opinion that the dispute involved in the
instant case brings it within the provisions of the Norris-LaGuardia
Act . . . The testimony of defendants' witnesses is to the effect that
they have attempted for some time to unionize the employees of
the Plaintiff Dairies and other cut-rate Dairies; that the picketing
complained of herein is an effort to compel the vendors, and wagon
drivers employed by the Plaintiff Dairies to join the defendant union

It is not material, as the Circuit Court of Appeals thought, that defendants' attempt to unionize the vendors was upon the condition that they would cease to handle milk as "vendors" if admitted to membership in the union. There are few instances of attempted unionization in which a change to union membership would not require some alteration in the conditions or terms of employment. Union membership contemplates change—change which it is believed will bring about better working conditions for the employees. Moreover, the evidence offered by the plaintiffs themselves shows that membership in defendant union would have involved no substantial change in the vendors' relationship to the dairies. Truck drivers employed by dairies were eligible for membership in the defendant union, and plaintiffs' evidence showed that the "vendors" were actually regarded as employees of the plaintiff dairies. The plaintiffs offered as a part of their evidence the articles of agreement between the plaintiff union and the plaintiff dairies; each of those contracts contains the following provision: "The term 'employee,' as used in this Agreement shall mean all wholesale and retail route salesmen or drivers and their helpers and assistants; all milk distributors commonly referred to as 'Vendors'; all persons employed in the sale and distribution of the Company's products; . . ." And each agreement provided for a closed shop and gave to plaintiff union the exclusive right to represent all the dairy's employees, including the vendors, for purposes of negotiating on "all questions of wages, hours, and conditions of employment that shall prevail in the Company's business." [11]

Whether rightly or wrongly, the defendant union believed that the "vendor system" was a scheme or device

for the purpose of improving working conditions and wages of said vendors and employees of the Plaintiff Dairies, and that the working hours and wage scale of Plaintiff Dairy's employees is lower than the Union scale."

[11] On the subject of the actual status of the vendors, the president

utilized for the purpose of escaping the payment of union wages and the assumption of working conditions commensurate with those imposed under union standards. To say, as the Circuit Court of Appeals did, that the conflict here is not a good faith labor issue, and that therefore there is no "labor dispute," is to ignore the statutory definition of the term; to say, further, that the conditioned abandonment of the vendor system, under the circumstances, was an issue unrelated to labor's efforts to improve working conditions, is to shut one's eyes to the everyday elements of industrial strife.

Nor does the controversy cease to be a labor dispute, as the Circuit Court of Appeals thought, because the plaintiff dairies' employees became organized.[12] This merely transformed the defendants' activities from an effort to organize non-union men to a conflict which included a controversy between two unions. A controversy "concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or

of one of the plaintiff dairies testified as follows:

"The Witness [Sigfried Weiss, president of the Lake Valley dairy]. He wants to know if they are employed by the dairy?

"Mr. Riskind [attorney for defendants]. Yes, that is all I want to know.

"A. Now that is not so easy to say, if they are employed or not. We have contracts, and they are bound to our dairy. They are actually employed by our dairy, but we have the vendor system, where they own their own trucks and they pay their own expenses and they buy milk at a certain price at our dairy. In one way they are employees, and in another way, we don't pay wages. We have to pay whatever they can make over a certain price. We charge them a certain price."

[12] "Under these conditions we think it cannot be fairly said that there is a good faith labor issue involved between the defendant union and either the dairies' employees or the 'vendors' or the stores. Especially is this true when we consider the fact that the 'vendors' are organized as members of a well-recognized union, which with their consent is acting as their representative in matters dealing with their employers." 108 F. 2d at 442.

seeking to arrange terms or conditions of employment"
is expressly included within the definition of a labor dis-
pute in the Norris-LaGuardia Act.

The District Court not only found that a labor dispute
existed, but also found that it was without jurisdiction to
grant an injunction because the requirements of the Nor-
ris-LaGuardia Act had not been met. We do not under-
stand that the Circuit Court of Appeals overturned this
finding. That court said: "Again, if jurisdiction were
conceded and there was a labor dispute involved, then it
is quite doubtful if appellants could recover because they
have not in every respect complied with the requirements
of the Norris-LaGuardia Act." We agree with the Dis-
trict Court that this case grows out of a labor dispute.
Since the requirements of the Norris-LaGuardia Act have
not been met, the court did not have jurisdiction to grant
an injunction unless by virtue of that phase of the bill
which charged a violation of the Sherman Anti-Trust Act.

*Second.* The Court of Appeals concluded that the de-
fendants' picketing activities constituted a secondary
boycott in violation of the Sherman Anti-Trust Act, and
that for this reason, regardless of the Norris-LaGuardia
Act, the District Court had jurisdiction to grant an in-
junction even though the case arose out of or involved a
labor dispute.[18] In this the court was in error.

No specific language of the Norris-LaGuardia Act is
pointed to in support of the theory that the Act was to
be inapplicable where injunctions are sought against
labor unions charged with violating the Sherman Act in

---

[18] The court said: "Moreover, we think it is clear from the findings
and from the undisputed evidence in this case that the appellees'
picketing activities constitute a secondary boycott, which is an un-
lawful activity, of which appellees could not avail themselves even
though a labor dispute were involved. See *Duplex Printing Press
Company* v. *Deering*, 254 U. S. 443; *Meadowmoor Dairies, Inc.*, v.
*Milk Wagon Drivers' Union of Chicago, No. 753*, 371 Ill. 377; 21
N. E. 2d 308," 108 F. 2d at 442.

the course of labor disputes.  On the contrary, § 1 of the Norris-LaGuardia Act provides that "No court of the United States . . . shall have jurisdiction to issue any restraining order or temporary or permanent injunction in a case involving or growing out of a labor dispute, except in a strict conformity with the provisions of this Act."  This unequivocal jurisdictional limitation is reiterated in other sections of the Act.  The Norris-LaGuardia Act—considered as a whole and in its various parts—was intended drastically to curtail the equity jurisdiction of federal courts in the field of labor disputes.  And this Court has said that "the legislative history of the Act demonstrates that it was the purpose of the Congress further to extend the prohibitions of the Clayton Act respecting the exercise of jurisdiction by federal courts and to obviate the results of the judicial construction of that Act." [14]

The committee reports on the Norris-LaGuardia Act reveal that many of the injunctions which were considered most objectionable by the Congress were based upon complaints charging conspiracies to violate the Sherman Anti-Trust Act.  To end the granting of injunctions of this type, § 5 of the Norris-LaGuardia Act deprived federal courts of jurisdiction to issue restraining orders or injunctions "upon the ground that any of the persons participating or interested in a labor dispute constitute or are engaged in an unlawful combination or conspiracy because of the doing in concert of the acts enumerated . . ."  In reporting the bill, the House Judiciary Committee said: "This section is included principally because many of the objectionable injunctions have been issued under the provisions of the anti-trust laws, a necessary prerequisite for invoking the jurisdiction of which is a finding of the existence of a conspiracy or combination and without which no injunction could have been issued." [15]

---

[14] *New Negro Alliance* v. *Sanitary Grocery Co.*, 303 U. S. 552, 562.
[15] H. Rep. No. 669, 72nd Cong., 1st Sess., p. 8.

102

The Norris-LaGuardia Act, passed in 1932, is the culmination of a bitter political, social and economic controversy extending over half a century. Hostility to "government by injunction" had become the rallying slogan of many and varied groups. Indeed, as early as 1914 Congress had responded to a widespread public demand that the Sherman Act be amended, and had passed the Clayton Act, itself designed to limit the jurisdiction of federal courts to issue injunctions in cases involving labor disputes. But the proponents of the Norris-LaGuardia Act felt that the jurisdictional limitations of the Clayton Act had been largely nullified by judicial decision. Thus, the Senate Judiciary Committee, reporting the Norris-LaGuardia Act, said: "That there have been abuses of judicial power in granting injunctions in labor disputes is hardly open to discussion. The use of the injunction in such disputes has been growing by leaps and bounds. . . . For example, approximately 300 were issued in connection with the railway shopmen's strike of 1922, . . ." [16] And on the same subject the House Judiciary Committee said: "These are the same character of acts which Congress in section 20 of the Clayton Act of October 15, 1914, sought to restrict from the operation of injunctions, but because of the interpretations placed by the courts on this section of the Clayton Act, the restrictions as contained therein have become more or less valueless to labor, and this section is intended by more specific language to overcome the qualifying effects of the decisions of the courts in this respect." [17] As an example of the judicial interpretation of the Clayton Act which the Committee said was "responsible in part for this agitation for further legislation," the Committee referred to the cases of *Duplex Printing Press Co.* v. *Deering*, 254 U. S. 443, *American Steel Foundries* v. *Tri-City Central Trades Council,* 257

[16] S. Rep. No. 163, 72nd Cong., 1st Sess., p. 8.
[17] H. Rep. No. 669, *supra*, pp. 7, 8.

U. S. 184, and *Bedford Cut Stone Co.* v. *Journeymen Stone Cutters' Association*, 274 U. S. 37. In these cases, the jurisdiction of the courts to grant injunctions had been upheld upon allegations and findings that the Sherman Anti-Trust Act had been violated.

Whether or not one agrees with the committees that the cited cases constituted an unduly restricted interpretation of the Clayton Act, one must agree that the committees and the Congress made abundantly clear their intention that what they regarded as the misinterpretation of the Clayton Act should not be repeated in the construction of the Norris-LaGuardia Act. For us to hold, in the face of this legislation, that the federal courts have jurisdiction to grant injunctions in cases growing out of labor disputes, merely because alleged violations of the Sherman Act are involved, would run counter to the plain mandate of the Act and would reverse the declared purpose of Congress.[18] The Circuit Court of Appeals was in error; its judgment is reversed and the judgment of the District Court dismissing the bill for injunction is affirmed.

*Reversed.*

---

[18] For example, one of the prerequisites to any injunction under the Act is "that the public officers charged with the duty to protect complainant's property are unable or unwilling to furnish adequate protection." Concerning this, the House Judiciary Committee said: "The last provision is considered desirable, because it often happens that complainants rush into a Federal court and obtain an injunction the enforcement of which requires the court to consider and punish acts which are and ought to be, under our system of government, cognizable in the local tribunals. Our Federal courts already are congested with cases ordinarly cognizable in the local police courts, . . ." H. Rep. No. 669, *supra*, p. 9.