**ILLINOIS CENT. R. CO. v. INTERNATION-AL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN & HELPERS OF AMERICA, UNION LOCAL 568, et al.**

Civ. A. No. 2935.

United States District Court
W. D. Louisiana, Monroe Division.

May 18, 1950.

Thompson, Thompson & Sparks, M. C. Thompson, Monroe, La., for plaintiff.

Hirsch, Greene & Barker, C. Paul Barker, Baton Rouge, La., for defendants.

DAWKINS, Chief Judge.

Plaintiff, Illinois Central Railroad Company (called "railroad"), applied to this court for a temporary restraining order and, upon hearing, a preliminary injunction under the following circumstances: Its lines are engaged in both intra- and interstate commerce, one of which extends from the City of Shreveport on the west to the City of Vicksburg in the State of Mississippi on the east; at Stevens, Louisiana, a few miles west of the City of Monroe in Ouachita Parish, it has two switch tracks which serve almost exclusively the Monroe Sand & Gravel Com-

pany (called "gravel company"), whose pit and plant are situated approximately a quarter-mile distant from the switch tracks; plaintiff sets out empty cars on its said tracks, which are picked up, loaded with sand or gravel at the plant and returned by the gravel company to said tracks with its own engines and employees, after which the contents are transported by the railroad to destination.

Plaintiff alleges that it has invested in the switch tracks some $40,000 and earns from freight charges in excess of $10,000 per month; that defendant union and other individual members are citizens of states other than Illinois, under whose laws the railroad was created; that the defendant local union No. 568 of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, a non-incorporated labor union, has its domicile and pursues its activities in the City of Monroe, Louisiana; that defendant, Monroe Building and Trades Council, is likewise a non-incorporated association of labor organizations, affiliated with the American Federation of Labor, also citizens of states other than Illinois, and likewise domiciled and pursuing its activities in the City of Monroe, Louisiana.

Further, that daily since January 5, 1950, defendants "in concert and groups" have picketed plaintiff's said switch tracks and main line, bearing placards proclaiming that plaintiff was "unfair to Truck Drivers, Helpers, and Warehousemen" and "This Job is Unfair—Monroe Building and Trades Council, AFL Affiliated Craft" and have "trespassed upon plaintiff's right of way and its tracks and have interfered with, hampered and hindered its train movements at Stevens, Louisiana, when its trains stopped thereat to provide and furnish car and transportation service to Monroe Sand & Gravel Company, and at times have threatened to do bodily harm to plaintiff's trainmen, should they ignore the protests and commands of the pickets not to cross their picket lines on plaintiff's right of way and tracks for the purpose of spotting empty cars for use by the Monroe Sand & Gravel Company or picking them up after they had been loaded and returned * * *." That on February 11, 1950, at about 12:20 P. M., when plaintiff's train crew stopped to pick up loaded cars, some fifteen or twenty of said pickets approached said train crew and "told them they should 'not go in there,' meaning by said expression that they forbid the crew to pick up the cars" and that the train crew "fearing violence and bodily harm * * * 'pulled out' without picking up the cars as they had been instructed to do by plaintiff"; that on February 15, 1950, a similar occurrence took place at about 1 o'clock A. M., when one of the defendants, Jack Alexander, by name "spokesman for the group of pickets," admonished Conductor White that his crew or train should not cross the picket line, "saying to him 'you are not crossing my picket line,' to which protest, admonition, warning, threat and command Conductor White replied, 'by that am I to understand my life would be in danger if I cross your picket line,' to which question Alexander replied, 'it could be, but your life won't be in danger if you don't cross our picket line,'" and that fearing violence the train crew withdrew and did not pick up said loaded cars but continued on its journey. Further, that on January 5, February 13 and 20, and on March 2, 1950, plaintiff's trains stopped at said point, set out empties and picked up loaded cars, notwithstanding similar protests and warnings, the crew "knowing at the time however that they had whatever protection could be given them by the Division Officers of the plaintiff and special agents of plaintiff, commissioned as peace officers, there present and observing the activities of the pickets"; but that on March 4, 1950, another train crew, because of such threats and warnings "departed without picking up the cars," which are now on the tracks of the plaintiff company; that since said time the crews of plaintiff's trains have refused to set out empties and pick up loaded cars because they "fear and believe that they might suffer bodily harm and have visited upon them at a later date reprisals of a violent nature if they

should ignore such warnings * * * and that said train crews insist that the pickets on plaintiff's property be removed by appropriate proceedings to the end that they may perform their duties in an orderly manner, without fear of bodily harm and violent reprisals."

The complaint further alleges:

"16. That plaintiff has no dispute or controversy of any kind with its employees, and plaintiff and its employees have no dispute or controversy with the International Brotherhood of Teamsters, Chauffers, Warehousemen and Helpers of America, Local Union No. 568, or its members and affiliates, or with the Monroe Building & Trades Council or its members and affiliates, concerning terms or conditions of employment, or concerning the negotiating, fixing, maintaining, changing or seeking to arrange terms or conditions of employment, or concerning employment relations, or concerning the designation of representation of its employees, or any other dispute or controversy arising out of the respective interests of employer and employee, and no labor association, or brotherhood, having contractual or other employment arrangements with plaintiff is affiliated with either of the above named defendant labor associations or organizations, or their affiliates.

"Plaintiff, therefore, specially avers that no labor dispute or controversy under the facts here exists between plaintiff and defendants.

"17. That the defendant labor associations, their affiliates, members and each and every person picketing and patrolling plaintiff's right of way and its tracks, acting on their own individual initiative or under the instructions of or for and on behalf of said labor associations, its affiliates and members, are, under the circumstances here alleged, mere bald and naked trespassers, unlawfully invading the property rights of plaintiff and interfering with and preventing its common carrier business and depriving it of the free and unrestricted use of its privately owned property.

"18. That plaintiff verily believes and so believing avers that unless enjoined, restrained and prohibited by this court the said defendant labor associations, their members, affiliates, pickets and the persons acting under their instructions or for or on their behalf, will continue to trespass on plaintiff's right of way and tracks and interfere with plaintiff's common carrier business and deprive it of the free use of its property, all to the irreparable loss, damage, and injury to plaintiff, for which plaintiff has no adequate remedy at law."

The prayer was for a temporary restraining order and, upon hearing, for a preliminary injunction enjoining and restraining defendants from further interfering with plaintiff's operation of its said railroad to the extent involved.

The bill was supported by affidavits of W. H. Chumley and A. Goodsell, Special Agents of plaintiff; F. K. Stanford, Trainmaster; M. C. Carroll, Manager of the Gravel Company; T. A. Younse; S. M. White, Conductor; J. C. Huffman, Brakeman; and J. D. Coffey, Traveling Engineer of the plaintiff.

A restraining order was granted on March 6, 1950, on bond in the sum of $3,000, setting the application for the preliminary injunction for hearing on the 16th of that month, but because of the fact that the Judge was busily engaged in a term of court in the City of Shreveport and elsewhere, the date was extended from time to time and the matter finally heard on April 4, 1950.

On the latter date, all of the defendants filed a motion to dismiss on the following grounds:

(1) Want of jurisdiction, based on:

(a) Insufficient allegations as to diversity of citizenship;

(b) Insufficient allegations as to the amount involved;

(c) That the suit involved a labor dispute and there was no showing of compliance with the Norris-LaGuardia Act, 29 U.S.C.A. § 101 et seq.; and

(d) Failure to exhaust remedies under the Labor Management Relations (Taft-Hartley) Act, 29 U.S.C.A. § 141 et seq.

(2) The National Labor Relations Board "is the exclusive agent under the latter act to petition for injunctive relief in a labor dispute."

Subject to said motion to dismiss, defendants answered the complaint, in effect admitting the picketing at the places and times alleged but denying any acts of violence and otherwise relying generally on the grounds set forth in the motion to dismiss.

## Opinion

■ On the issue of jurisdiction, insofar as the citizenship of the parties is concerned, it is believed that the allegations above quoted and referred to are sufficient to establish the diversity necessary, in that they disclose the plaintiff is a citizen of Illinois and the defendants of other states, with the domicile of the local union involved in the City of Monroe.

This leaves for determination the plea to the jurisdiction with respect to the following questions:

(1) Was and is a labor dispute involved within the meaning of the Norris-LaGuardia Act?

(2) If so, does the situation presented here by the plaintiff railroad, as to which labor matters are governed by another statute, to wit, The Railway Labor Act, 45 U.S.C.A. § 151 et seq., bring the controversy within the purview of the Labor Management (Taft-Hartley) Act, or is it expressly excluded therefrom?

(1) The facts as to the relations and methods of operation as between the defendants, or those whom they seek to represent, on the one hand, and the gravel company, on the other, as revealed by the record, are as follows:

The gravel company operates with hourly-employed drivers of its own trucks, as well as by engaging persons who own, maintain and operate their trucks solely at their own expense, at such times as they choose and work is available, on their own responsibility, and on a mileage basis, with no obligation on the part of the gravel company for social security, taxes, etc., but under an arrangement whereby that company collects from the customer the price of its products, which includes the costs of delivery, and pays the owners of the trucks at stated intervals.

■ The defendants had presented the gravel company with a formal contract which they asked it to execute with the local union, fixing rates of pay for self-owned trucks only. However, an affidavit of the business agent of the union is to the effect that individual drivers of the gravel company's trucks had made application for membership, and the purpose was to include them all in the union and the contract for the handling of the gravel. It would seem, therefore, that there was a labor dispute within the meaning of the Norris-LaGuardia Act, at least insofar as hourly drivers of the gravel company and the defendants were concerned. Lauf et al. v. E. G. Shinner & Co., Inc., 303 U. S. 323, 58 S.Ct. 578, 82 L.Ed. 872; Milk Wagon Drivers' Union, Local No. 753, International Brotherhood of Teamsters, Chauffeurs, Stablemen and Helpers of America et al. v. Lake Valley Farm Products, Inc., et al., 311 U.S. 91, 61 S.Ct. 122, 85 L.Ed. 63; Amalgamated Ass'n of Street, Electric Ry. & Motor Coach Employees of America et al. (National Labor Relations Board, Intervenor) v. Dixie Motor Coach Corporation, 8 Cir., 170 F.2d 902.

(2) The National Labor Relations Act, 29 U.S.C.A. § 151 et seq., excludes from its provisions as an "'employer' * * * any person subject to the Railway Labor Act * * *," and in a situation identical with the present case the National Labor Relations Board itself has held that it has no power to deal with a matter of this kind where the alleged secondary boycott is carried on against a railroad. See International Rice Milling Company, Inc., et al. v. International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Local No. 201 (the same defendant union as here), 84 National Labor Relations Board 47, Cases Nos. 15-CC-1 through 15-CC-4, June 20,

1949, National Labor Relations Board Decisions, Commerce Clearing House, Volume H, Page 9440. The general counsel of the Board there sought a preliminary injunction against the picketing as a secondary boycott and, therefore, an unfair labor practice within the meaning of Section 8(b) (4) (A) and (B) of the Labor Management Act, and the examiner for the Board made recommendations accordingly, but the Board held to the contrary and dismissed the proceeding as beyond its jurisdiction. In doing so, it was said:

"* * * The relevant portion of Section 8(b) (4) (A) and (B) of the Act provides that it shall be an unfair labor practice for a labor organization to induce or encourage the 'employees' of any 'employer' to engage in a secondary boycott. However, Section 2(2) and (3) of the Act provide in part that the term 'employer' should not include 'any person subject to the Railway Labor Act,' and that the term 'employee' should not include any individual 'employed by an employer subject to [the Railway Labor Act.]'

"In view of the clear language of the amended Act, and in the absence of any indication in the legislative history that Congress intended a different result, we must conclude that none of the Respondent's (union's) aforesaid activities induced or encouraged *employees* of an *employer* to engage in a secondary boycott, within the meaning of Section 8(b) (4) (A) or (B). Our conclusion in this respect is buttressed by the separate treatment that Congress has historically accorded railroads, their employees, and the organizations of their employees. In our opinion, a sudden contrary intent on the part of the Eightieth Congress should not be inferred in the absence of a clear expression in the statute that such was the Congressional purpose. We find no suggestion of such a clear expression here. Indeed, the fact that the 1947 amendments changed the definition of employee by excluding persons 'employed by an employer subject to the Railway Labor Act' whereas no such exclusion was contained in the Wagner Act before amendment is, if anything, an expression of an opposite intention."

Defendants have cited many authorities as sustaining their contention that a labor dispute is involved here, the more important of which will be considered.

Section 8 of the Labor Management Relations Act above, defines unfair labor practices, one of which was involved in the above cited case by the Board, wherein the striking employees of the rice mills were picketing the railroad line, and it was contended that the Board alone might obtain an injunction. Similarly, defendants argue that the railroad in the present case might have petitioned the Board to seek an injunction, but the ruling in the case cited refutes this argument. It is true that in Brotherhood of Railroad Trainmen, Enterprise Lodge No. 27 et al. v. Toledo, Peoria & Western Railroad, 321 U.S. 50, 64 S.Ct. 413, 88 L.Ed. 534, 150 A.L.R. 810, it was held that Section 8 of the Norris-LaGuardia Act required the railroad, in a dispute with its own employees, to comply with the conditions precedent therein before a federal court would have jurisdiction to issue an injunction. However, that case, as stated, grew out of differences between the railroad and its own employees, which were controlled by the Railway Labor Act. It did not involve, as here, the picketing of the property of a wholly disinterested third party, who had no concern with the dispute between another employer and its employees, nor was it in any manner engaged in the same or a kindred type of business.

■ Considering the contention that only the Labor Board may seek an injunction against unfair labor practices under the Labor Management Relations Statute of 1947, in support of which Amalgamated Ass'n of Street, Electric Ry. & Motor Coach Employees of America et al. v. Dixie Motor Coach Corporation, 8 Cir., 1948, 170 F.2d 902, and authorities cited therein, are relied upon, it is believed sufficient to say that those decisions, in each instance, involved industries other than a railroad. As pointed out by the Board in

Interstate Rice Milling Company et al., *supra*, Congress has "historically" separated railroads from all others in its legislation dealing with labor relations. It would seem to follow that where, as here, the plaintiff's sole connection with the dispute between defendant and the gravel company is that it tenders its lines and switch tracks, for use which form no part of the gravel company's premises but are substantially removed from the latter's plant and operations where the controversy arises, the activities of defendants as against the railroad are indistinguishable from any other trespass. Plaintiff does not have to cross any picket line at or near the plant. In the course of the argument, this court suggested that perhaps the reason for the defendants having determined to extend their picket line approximately a quarter-mile so as to include the plaintiff's tracks, was the belief that since the plaintiff's employees were also members of unions of their own, it would be easier to accomplish the desired results because of the natural disposition of one union man to respect the picket lines of another. If this can be done within a distance of a quarter-mile, there seems to be no reason why it cannot be extended many times further. This court is forced to the conclusion that the situation here justified the plaintiff in applying to the court for the exercise of its equity powers, as would be true with respect to any other trespass upon its property.

What has thus been said applies equally to the motion to dismiss the complaint and to the merits of the application for a preliminary injunction. The former should be overruled, and the latter granted.

■ It is believed that the facts above found as to the amount invested in the switch tracks, and the monthly earnings by plaintiff from the business furnished by the gravel company, which the activities of the defendants serve to destroy and exterminate, more than $3,000, is involved exceeding the minimum jurisdictional amount of this court; and the plea to the jurisdiction on that score should be overruled.