TEXAS MILLINERY COMPANY et al.,
Plaintiffs,

v.

UNITED HATTERS, CAP AND MILLI-
NERY WORKERS INTERNATIONAL
UNION, AFL-CIO, et al., Defendants.

Civ. A. No. 9100.

United States District Court
N. D. Texas,
Dallas Division.

April 23, 1964.

Emil Corenbleth, Dallas, Tex., for Texas Millinery Co., Sue Ellen Hat Co., Cedar Crest Hats, Inc., Park Layne Hats, Jan Leslie Hats, Inc., Goldstein Hat Mfg. Co., Pete Brooks Hat Co., Inc., Bernstein

Millinery Co., Frank M. Benson, plaintiffs.

Charles J. Morris, Dallas, Tex., for United Hatters, defendant.

Friedlander & Gaines, New York City and Morris L. Jaffe, Dallas, Tex., Ogus, Rabinovich & Ogus, Inc., and Rhealee Stores, Inc., defendants.

HUGHES, District Judge.

The issue in this case is whether the United Hatters, Cap and Millinery Workers' International Union, AFL-CIO violated the Sherman Anti-Trust Act.

Plaintiffs, Texas Millinery Company, Sue Ellen Hat Company, Cedar Crest Hats, Parke Layne Hats, Jan Leslie Hats, Goldstein Hat Manufacturing Company, Pete Brook Hat Company, Bernstein Millinery Company and Frank M. Bensen, hereinafter referred to as Millinery Companies, are manufacturers of ladies millinery doing business in Dallas, Texas. The Defendant is the United Hatters, Cap and Millinery Workers International Union, AFL-CIO, hereinafter called Union.

Millinery Companies' complaint is in four counts. The first count alleged a violation by the Union of the Sherman Act by entering into a conspiracy with two retailers of ladies millinery, Ogus, Rabinovich and Ogus, Inc., hereinafter called O.R.O. and Rhealee Stores, Inc., hereinafter called Rhealee, in restraint of trade or commerce among the several states. The Union denied the conspiracy.

Count Two of Millinery Companies' complaint alleged a common law conspiracy in which Millinery Companies contended that, pursuant to the conspiracy alleged in Count One, O.R.O. and Rhealee ceased purchasing from Millinery Companies and in furtherance of the conspiracy the agents of Union attempted to induce and coerce other customers of Millinery Companies to cease purchasing goods from said companies. It was further alleged that such acts were undertaken maliciously and without justification for the purpose of damaging Millinery Companies in the sale of their mer-chandise, and that such acts proximately resulted in damages to Millinery Companies. Union denies the conspiracy and contended any action was lawful.

Count Three alleged the Union was guilty of unfair labor practices involving secondary boycott activities. It was further alleged that no labor dispute existed between Millinery Companies and Union, but in spite of said fact Union exerted unlawful economic pressure on certain retailers to restrict or eliminate their purchases from Millinery Companies. Union contended that a labor dispute existed and that all of its acts were legal.

Count Four alleged a common law unlawful, malicious interference with the business of Millinery Companies by Union. Union denied the allegations.

In response to special issues the jury found for Union on Counts Two, Three and Four.

On Count One the jury found (1) that Union entered into a conspiracy with O.R.O. and Rhealee wherein O.R.O. and Rhealee would not buy any millinery from the Dallas Market except that manufactured by Bierner & Sons, a unionized millinery company, (2) that the conspiracy was in restraint of trade or commerce among the several states, and (3) that the conspiracy proximately resulted in damages in specific amounts to each Millinery Company. The jury also found that the action of Union in inducing O.R.O. and Rhealee to cease the purchase of goods from Millinery Companies was undertaken without malice and with justification.

Both parties filed motions for judgment—Millinery Companies on the verdict on Count One and Union notwithstanding the verdict on Count One, and on the verdict on Counts Two, Three and Four. Millinery Companies' motion was overruled, Union's granted. The verdict of the jury on Counts Two, Three and Four was sustained by the evidence and is not in controversy. The question on the motion for judgment was whether as a matter of law the findings of the jury

on Count One constituted a violation of the Sherman Anti-Trust Act.

For many years prior to the filing of this suit Union had been attempting to organize employees of the Millinery Companies. In early 1962 Union in promoting the use of the union label decided to conduct a national campaign in which leaflets would be distributed to the public at entrances to retail stores selling ladies millinery, urging the public to buy union-made headgear and not buy non-union-made headgear. A part of this program was directed at Plaintiff Millinery Companies and other non-union Dallas millinery manufacturers.

O.R.O. and Rhealee Stores, Inc., in 1962 and prior thereto were corporations engaged in the retail sale of ladies millinery, either in stores owned by such corporations or in departments leased from various department stores. Joseph Rabinovich, at the times involved herein, was the president and treasurer of O.R.O. and the owner of all the common stock of Rhealee. He controlled the policies and operations of both corporations.

On February 22, 1962, Alex Rose, president of Union contacted Joseph Rabinovich and advised him that as a part of the national campaign to promote the sale of union-made hats Union intended to leaflet any stores which bought merchandise or sold hats without the union label. Thereafter in March 1962, solely as a result of such inducement by Union, Mr. Rabinovich decided that O.R.O. and Rhealee would discontinue purchasing merchandise from the non-union Dallas Market and he so informed Alex Rose. For a period of some eight or nine months there were no purchases by these companies from such market.

Rabinovich's motive in ceasing to do business with Dallas non-union millinery manufacturers was distaste for union leafletting and there was no evidence, direct or indirect, that the agreement of Rabinovich with Rose that O.R.O. and Rhealee would cease purchasing non-union products had as its purpose or effect Union aiding and abetting O.R.O. and Rhealee to either restrain interstate trade in the ladies millinery industry or to give O.R.O. and Rhealee an economic advantage over its competitors in such industry.

There was no evidence that the action by Rabinovich to cease doing business with non-union Dallas millinery manufacturers had any effect on business concerns other than Plaintiffs or that Union had any motives other than those described by Rose; that is, to promote the sale of union-made goods and to discourage the sale of non-union-made goods. There was no evidence of any agreement or conspiracy or understanding between Union and any business concerns except O.R.O. and Rhealee.

The question is whether these facts constituted a violation of the Sherman Anti-Trust Act.

■ As defined by the Norris-LaGuardia Act, 29 U.S.C.A. § 113,

"The term 'labor dispute' includes any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether or not the disputants stand in the proximate relation of employer and employee."

Court decisions have construed this provision of the act liberally. Lauf v. E. G. Shinner, 303 U.S. 323, 58 S.Ct. 578, 82 L.Ed. 872, Milk Wagon Drivers', etc. v. Lake Valley Farm Products, 311 U.S. 91, 61 S.Ct. 122, 85 L.Ed. 63.

■ It is clear from the Act itself and subsequent decisions that where a Union has sought unionization of employees for many years a controversy bearing on an employer-employee relationship is involved and a primary labor dispute exists. The evidence in this case unquestionably shows such a controversy; accordingly, a primary labor dispute existed between Union and Millinery Companies.

Since there was a primary labor dispute between Union and Millinery Companies Section 20 of the Clayton Act, 29 U.S.C.A. § 52, immunizes Union from anti-trust sanctions, Section 20 providing in part:

"And no such restraining order or injunction shall prohibit any person or persons * * * from ceasing to patronize * * * any party to such dispute, or from recommending, advising, or persuading others by peaceful and lawful means so to do * * * nor shall any of the acts specified in this paragraph be considered or held to be violations of any law of the United States."

The purpose of Union in inducing O.R. O. and Rhealee to cease doing business with Millinery Companies was to unionize employees of Millinery Companies and promote the sale of union goods. Union acted solely in its self interest and with justification. This is a legitimate union activity, approved in the statement of Justice Black speaking for the majority, in Bradley Co. v. Local Union No. 3, I. B.E.W., 325 U.S. 797, 65 S.Ct. 1533, 89 L.Ed. 1939.

"Employers and the union did here make bargaining agreements in which the employees agreed not to buy goods manufactured by companies which did not employ the members of Local No. 3. We may assume that such an agreement standing alone would not have violated the Sherman Act." 325 U.S. at 809, 65 S.Ct. at 1540, 89 L.Ed. 1939.

■ To create union coverage under the Sherman Act the union must combine with non-labor groups for some illegitimate purpose. Thus, for example, the Eighth Circuit in Adams Dairy Co. v. St. Louis Dairy Co., 260 F.2d 46, 54 employed this language:

"Under decisional law, a labor organization is immune to Sherman Act liability unless it is found to have conspired with non-labor

groups for purposes not connected with legitimate labor ends."

The precise issue was involved in the Fifth Circuit decision in East Texas Motor Freight Lines v. International Broth. of Teamsters, 163 F.2d 10. Plaintiffs alleged that the defendant union had "conspired with the owners to establish, and have established a boycott" in violation of the Sherman Anti-Trust Act. The Court found that each of the defendant carriers had "separately acceded to the demands of the union [to cease doing business with plaintiffs] because, and only because, they wished to avoid labor trouble with it." The Court further found that the union had instituted the boycott "in order to bring sufficient pressure upon plaintiff and its employees to force the latter to join the union." The Fifth Circuit in upholding the trial court dismissal had this to say:

"[W]e are in no doubt that the case is wholly unlike those dealt with in Allen Bradley Co. v. Union, * * * and is one arising out of a labor dispute."

The purpose of Rabinovich in agreeing to cease doing business with Millinery Companies was simply to avoid being leafletted. He did so reluctantly, not being moved by any desire to restrain interstate commerce. Union in its action was not aiding or abetting O.R.O. and Rhealee nor was it acting in their interest, but solely in its own interest. There was no combination on the part of Union with O.R.O. and Rhealee. The two companies merely acceded to a request of Union. As stated by Justice Black in Bradley Co. v. Local Union No. 3, I.B.E.W. supra

"the same labor union activities may or may not be in violation of the Sherman Act, dependent upon whether the union acts alone or in combination with business groups." 325 U.S. at 810, 65 S.Ct. at 1540, 89 L.Ed. 1939.

Norris-LaGuardia as interpreted by the Supreme Court in United States v.

Hutcheson, 312 U.S. 219, 61 S.Ct. 463, 85 L.Ed. 788 immunized such activity from anti-trust sanctions:

"So long as a union acts in its self interest and does not combine with non-labor groups the licit and the illicit under § 20 [Clayton Act] are not to be distinguished by any judgment regarding the wisdom or unwisdom, the rightness or wrongness, the selfishness or unselfishness of the end of which the particular union activities are the means."

Under all the circumstances of this case the action of Union in inducing O.R.O. and Rhealee to cease doing business with Millinery Companies was not a violation of the Sherman Act.

The contention of Millinery Companies that the agreement by O.R.O. and Rhealee to cease doing business with Millinery Companies was a violation of the anti-trust laws likewise has been rejected by Congress as recently as 1959.

During the congressional debates in 1959 concerning amendments to the Labor Management Relations Act of 1947 numerous attempts were made to make certain union-induced agreements, resulting in an employer's boycott of non-union products, a violation of the anti-trust laws and of the boycott provisions of Section 8(b) (4), 29 U.S.C.A. § 158 (b) (4).

In the House specific proposals were made to place unions under anti-trust limitations. Congressman Alger introduced H.R. 8003 in order to:

"* * * [make] it unlawful for a union to enter into any arrangement, either voluntary or coerced, with an individual employer or group of employers or with other unions, which would lead to product boycotts, price fixing or other types of restrictive trade practices." 105 Cong.Rec. House, June 29, 1959, p. 11046.

Congressman Griffin, sponsor of the Landrum-Griffin bill that ultimately formed the basis for the Labor-Management Act of 1959, responded to Congressman Alger's proposal, saying:

"I believe I speak for [Mr. Landrum] * * * when I say that if amendments are offered on the floor to add anti-trust provisions or others that have been mentioned, I for one will oppose it. [We] * * * have tried to balance delicately the provisions which we believe should be in a bill at this time and which a majority of this body could support." 105 Cong.Rec.House, p. 14199, August 11, 1959.

Later, Congressman Hoffman offered an amendment from the floor to the Landrum-Griffin Bill, which provided in part:

"Nothing contained in this Act shall be deemed to make lawful any contract, combination, or conspiracy in restraint of trade or commerce entered into between two or more labor organizations * * * or between any individual labor organization and any employer or other person or persons, which * * * if entered into by persons other than labor organizations would be in violation of the anti-trust laws. Nothing contained in this Act or in the Act of March 23, 1932 (29 U.S.C.A. 101 [limiting jurisdiction of U. S. Courts to issue restraining orders and injunctions in cases involving or growing out of labor disputes] shall be deemed to exempt from the application of the [federal or state] anti-trust laws * * * any employer, labor organization, or other persons who became a party to or engages or participated in such contract, combination, or conspiracy in restraint of trade or commerce * * *." 105 Cong.Rec.House, p. 13513, August 13, 1959.

The proposed amendments by Congressmen Alger and Hoffman, were all rejected by the House, preserving the unions' right to peacefully persuade employers to refrain from buying non-union products.

In the Senate debates Senator McClellan introduced an amendment from the

floor, identified as 4–17–59C, designed to make unlawful union activities which caused third party employers to cease doing business with employers producing non-union goods. Senator Curtis, a supporter of the McClellan amendment, described the McClellan amendment as follows:

"It makes it unlawful to coerce or induce a third party employer to cease doing business with another person. Suppose, for example, that a union wants an employer to sign a contract under which his employees must belong to the union. Suppose further that the employees do not want the union and have so indicated their desire. * * * But suppose the union plays it smart. Instead of calling the strike just described it simply goes to the second employer and says, 'Look here; you do not want any trouble with us; stop doing business with the first employer. He is giving us trouble by not signing up with us.' There is nothing in present law to bar such direct pressure upon the second employer. * * * He may have a contract with it and wants to maintain friendly relations. He can do business with someone else who is not embroiled in union troubles. So he simply looks elsewhere for customers or for his supplies. Meanwhile, the first employer will frequently give in to the union and force his employees to join it or he will just go out of business." 105 Cong.Rec.Senate, April 24, 1959, p. 5974.

Senator Kennedy, responded to the McClellan amendment as follows:

"The amendment of the Senator from Arkansas goes far beyond that, and would prevent any agreement of any kind between the union and employer B that employer B will cease doing business with employer A during the period of the strike. "If the strike is against a sweatshop industry, I think the Senator from Arkansas can see how far reaching his amendment would be. I believe it is in the public interest for employers and unions to agree not to do business with employers who pay substandard wages and maintain substandard working conditions. I believe it is proper for a union to say to employer B, 'Please do not subcontract any work to subcontractors who maintain sweatshop conditions.' I would not say that the union should have the right to say to the contractor, 'If you do not do as we ask, we are going to strike against you.' But at least the union should have the right to say to the employer, 'Our relations will be far better if you do not deal with employer A,' so long as the union does not say, 'We will strike if you continue to do business with him.'" 105 Cong.Rec. Senate, April 24, 1959, p. 5972.

On that same day the McClellan amendment was rejected by the Senate.

The result of the Congressional debates was the preservation of labor's anti-trust immunity, imposing, however, certain limitations as appear in Section 8(e) of the amended Act, 29 U.S.C.A. § 158(e).

The legislative history of Sec. 8(e) clearly shows the intent of Congress that certain union-induced agreements resulting in an employer's boycott of non-union products should not be made a violation of the anti-trust laws nor of the secondary boycott provisions of 29 U.S.C.A. § 158(b) (4) and, since Congress has the power to decide what the policy of the law shall be, such intent should be recognized and obeyed in the interpretation of the Act.

█ The Action of the Union in inducing Rhealee and O.R.O. to cease buying from Millinery Companies, not being a secondary boycott within the prohibition of 29 U.S.C.A. § 158(b) (4), does not give rise to a suit for damages under the provisions of 29 U.S.C.A. § 187 (b).

The validity of the agreement of O.R.O. and Rhealee whereby O.R.O. and Rhealee ceased to purchase from Millinery Companies is governed by the unfair labor practice provisions of 29 U.S.C.A. § 158(e).

The provisions of 29 U.S.C.A. § 187(b) providing for jurisdiction of a civil action for damages in the District Courts of the United States being limited to violations of section 158(b) (4), exclusive jurisdiction of a violation of § 158(e) and the application of sanctions thereunder is in the National Labor Relations Board. This Court, therefore, cannot and does not determine whether the aforesaid agreement is an unfair labor practice under 29 U.S.C.A. § 158(e).

The jury's responses to special issues submitted in connection with Counts Two, Three and Four were fully supported by the evidence and establish that Union's conduct under said Counts was not unlawful; therefore, (1) Millinery Companies failed to establish the existence of a common law conspiracy whereby acts were undertaken maliciously and without justification for the purpose of damaging Millinery Companies in the sale of their merchandise; (2) the Union's leafletting of retailers, as well as the threats to engage in such leafletting, constituted lawful economic pressure and was not a violation of 29 U.S.C.A. § 158(b) (4); and (3) Union's conduct did not constitute an unlawful interference with Millinery Companies' business nor did Union act with malice.

In view of the jury's verdict on Counts Two and Four, it is unnecessary for the Court to determine whether jurisdiction existed as to said Counts, and the findings and conclusions thereunder do not represent a recognition of jurisdiction over said common law counts.

The jury having found for the Defendant and against Plaintiffs on Counts Two, Three and Four and the Court having concluded that the agreement between Rose and Rabinovich does not give rise to a Sherman Act violation and that such agreement is governed by the provisions of 29 U.S.C.A. § 158(e), this Court does not have jurisdiction under such provisions; therefore, for the reasons stated above, judgment is rendered for Defendant on all Counts.