**CIMARRON COAL CORPORATION, Plaintiff-Appellee,**

v.

**DISTRICT NO. 23, UNITED MINE WORKERS OF AMERICA, et al., Defendants-Appellants.**

No. 19266.

United States Court of Appeals Sixth Circuit.

Oct. 2, 1969.

Albert W. Spenard, Madisonville, Ky., for appellants.

James G. Wheeler, Paducah, Ky., (James G. Wheeler, Paducah, Ky., W. Stuart McCloy, Memphis, Tenn., on the brief), for appellee.

Before EDWARDS and CELEBREZZE, Circuit Judges, and HOGAN, District Judge.*

EDWARDS, Circuit Judge.

This is an appeal from an injunction issued in a labor dispute by the United States District Court for the Western District of Kentucky. Appellant, United Mine Workers, contends that sections 4 and 7 of the Norris-LaGuardia Act (29 U.S.C. §§ 101–115 (1964)) deprived the District Court of jurisdiction to enter the injunction complained of. Appellee, Cimarron Coal Corporation, contends that the United Mine Workers mass picketing of its mine constituted "violence" within the meaning of section 4 of the Norris-LaGuardia Act and that the conditions of section 7 (including subparagraph (e) concerning a breakdown of local law enforcement) of that Act had also been met.

Section 1 of the Norris-LaGuardia Act provides:

"No court of the United States, as defined in this chapter, shall have jurisdiction to issue any restraining order or temporary or permanent injunction in a case involving or growing out of a labor dispute, except in a strict conformity with the provisions of this chapter; nor shall any such restraining order or temporary or permanent injunction be issued contrary to the public policy declared in this chapter." 29 U.S.C. § 101 (1964).

* Honorable Timothy S. Hogan, United States District Judge for the Southern District of Ohio, sitting by designation.

We approach the issues of this case with this statutory mandate in mind.

The facts show that Cimarron Coal Corporation operated a non-union mine in Hopkins County, Kentucky, employing approximately 30 miners. In October of 1968, the United Mine Workers were striking mines in Hopkins County where they had had bargaining rights. They had never had a contract with Cimarron nor does this record make any showing of any union membership. Beginning on October 10 and continuing until October 25, 1968, when this injunction was entered, the United Mine Workers undertook to organize Cimarron Coal Corporation by the expedient of appearing in front of the plant gates with 75 to 100 pickets and picket signs.

Cimarron Coal thereupon wrote the state police and the local sheriff asking for protection. The sheriff and some state police did appear and some of the employees did go in to work. From this record it would appear that there was something less than a complete mobilization of law enforcement. There was, however, no failure on the part of law enforcement officials to respond, no testimony from any law enforcement official offered before the District Judge pertaining to any breakdown of local or state law enforcement, and no property damage or physical assault upon anyone.

The thrust of Cimarron's case for federal injunctive relief is that the mass picketing constituted "violence" within the meaning of section 4 of Norris-LaGuardia and that the limited response of local and state police met the conditions of section 7(e) of that Act.[1]

Since we believe that the conditions set forth in section 7(e) were not met and that because of this the court had no jurisdiction to enter the injunction, we find no need to consider or decide the section 4 issue.

Section 7 of the Norris-LaGuardia Act provides:

"No court of the United States shall have jurisdiction to issue a temporary or permanent injunction in any case involving or growing out of a labor dispute, as defined in this chapter, except after hearing the testimony of witnesses in open court (with opportunity for cross-examination) in support of the allegations of a complaint made under oath, and testimony in opposition thereto, if offered, and except after findings of fact by the court, to the effect—

* * *

"(e) That the public officers charged with the duty to protect complainant's property are unable or unwilling to furnish adequate protection." 29 U.S.C. § 107 (1964).

Bearing on these issues, the District Judge said:

"Moving now to the next troublesome problem, and that is No. 5 under Section 107, requiring a finding that the public officers were unwilling or unable to furnish adequate protection, I do find that the sheriff and the State Police were called on at least three occasions and entered the general vicinity.

"It appears that they cleared the roadway, however, even when they were in the general vicinity the plaintiff's proof shows that two vehicles of employees were turned back. This is indicative, to me, that the public officials made no real meaningful response insofar as escorting or offering to escort or insuring protection to any

---

1. Appellee Cimarron also argued that in this case, where there was diversity of citizenship, Kentucky law applied and that Kentucky law authorized injunctive relief to enjoin even peaceful picketing when circumstances indicate that its purpose is unlawful, citing Blue Boar Cafeteria Co. v. Hotel & Restaurant Employees & Local 181, 254 S.W.2d 335 (Ky. Ct.App.1952), cert. denied, 346 U.S. 834, 74 S.Ct. 41, 98 L.Ed. 357 (1953). Since, however, the Norris-LaGuardia Act is the decisive standard as to federal jurisdiction (See Lauf v. E. G. Shinner & Co., 303 U.S. 323, 58 S.Ct. 578, 82 L.Ed. 872 (1938)), we have no need to determine this issue.

plaintiff employee who wished to drive between the parked cars and the large number of defendants' associates there gathered.

"It is not what happens when the law enforcement officers are actually present, as the defense counsel seems to rely; if the freedom of action of the plaintiff's emloyees is at other time prohibited by the defendants * * *."

The District Judge also added:

"[M]y reaction to this case, gentlemen, is that it is one viewed by me to be extremely marginal in chinning the bar of legal requirements of Section 107 when viewed in the light of occurrences there weighed in the balance of the unquestioned right of the mine workers to peacefully assemble and to espouse the cause of their union fraternity."

Since we believe that the chin did not get over the bar, we reverse and vacate the injunction.

We cannot read the District Judge's quoted words as a finding that "the public officers charged with the duty to protect complainant's property are unable or unwilling to furnish adequate protection." 29 U.S.C. § 107(e) (1964). Indeed, if his holding was subject to that construction, we would have to say that this record afforded no support for it and that it was clearly erroneous.

We think this record indicates only pro forma requests by plaintiff-appellee for protection and that it fails to demonstrate either inability or unwillingness of state law enforcement to respond.

The history of the Norris-LaGuardia Act offers no doubt that Congress meant to limit within strictly, defined bounds the jurisdiction of the federal courts to issue injunctions in labor disputes. A unanimous Supreme Court described the Congressional intent in these words:

"The Norris-LaGuardia Act, passed in 1932, is the culmination of a bitter political, social and economic controversy extending over half a century. Hostility to 'government by injunction' had become the rallying slogan of many and varied groups. Indeed, as early as 1914 Congress had responded to a widespread public demand that the Sherman Act be amended, and had passed the Clayton Act, 38 Stat. 730, itself designed to limit the jurisdiction of federal courts to issue injunctions in cases involving labor disputes. But the proponents of the Norris-LaGuardia Act felt that the jurisdictional limitations of the Clayton Act had been largely nullified by judicial decision. Thus, the Senate Judiciary Committee, reporting the Norris-LaGuardia Act, said: 'That there have been abuses of judicial power in granting injunctions in labor disputes is hardly open to discussion. The use of the injunction in such disputes has been growing by leaps and bounds. * * * For example, approximately 300 were issued in connection with the railway shopmen's strike of 1922, * * *.'[16]

"[16]. S.Rep.No.163, 72nd Cong., 1st Sess., p. 8.

And on the same subject the House Judiciary Committee said: 'These are the same character of acts which Congress in section 20 of the Clayton Act of October 15, 1914, 29 U.S.C.A. § 52, sought to restrict from the operation of injunctions, but because of the interpretations placed by the courts on this section of the Clayton Act, the restrictions as contained therein have become more or less valueless to labor, and this section is intended by more specific language to overcome the qualifying effects of the decisions of the courts in this respect.'[17]

"[17]. H.Rep.No.669, supra, pp. 7, 8."

Milk Wagon Drivers' Union Local 753, Etc. v. Lake Valley Farm Products, 311 U.S. 91, 102, 61 S.Ct. 122, 127, 85 L.Ed. 63 (1940).

In the leading case upon the subject the United States Supreme Court set this standard for interpretation of the Norris-LaGuardia Act:

"That Act's language is broad. The language is broad because Congress was intent upon taking the federal courts out of the labor injunction busi-

ness except in the very limited circumstances left open for federal jurisdiction under the Norris-LaGuardia Act. The history and background that led Congress to take this view have been adverted to in a number of prior opinions of this Court in which we refused to give the Act narrow interpretations that would have restored many labor dispute controversies to the courts.[7]

"[7]. See e. g., United States v. Hutcheson, 312 U.S. 219, 61 S.Ct. 463, 85 L.Ed. 788; Milk Wagon Drivers' Union etc. v. Lake Valley Farm Products, 311 U.S. 91, 61 S.Ct. 122, 85 L.Ed. 63; New Negro Alliance v. Sanitary Grocery Co., 303 U.S. 552, 58 S.Ct. 703, 82 L.Ed. 1012; Lauf v. E. G. Shinner & Co., 303 U.S. 323, 58 S.Ct. 578, 82 L.Ed. 872. And see Allen Bradley Co. v. Local Union No. 3, I.B.E.W., 325 U.S. 797, 805, 65 S.Ct. 1533, 1538, 89 L.Ed. 1939."

Marine Cooks and Stewards, A.F.L. v. Panama S.S. Co., 362 U.S. 365, 367–370 and n. 7, 80 S.Ct. 779, 783, 4 L.Ed.2d 797 (1960).

See also Order of Railroad Telegraphers v. Chicago & North Western Ry., 362 U.S. 330, 80 S.Ct. 761, 4 L.Ed.2d 774 (1960); Lauf v. E. G. Shinner & Co., 303 U.S. 323, 58 S.Ct. 578 (1938).

One part of the purpose of Congress in adopting the Norris-LaGuardia Act undoubtedly was to leave in the hands of state and local authorities those problems of public order which they were capable of handling. Concerning the section of the Norris-LaGuardia Act (§ 107(e)) which we have held to control this case, the House Judiciary Committee (in language which we consider peculiarly apt here) said:

"The last provision is considered desirable, because it often happens that complainants rush into a Federal court and obtain an injunction the enforcement of which requires the court to consider and punish acts which are and ought to be, under our system of government, cognizable in the local tribunals. Our Federal courts already are congested with cases ordinarily cog-

nizable in the local police courts, * * *" H.R.Rep. No. 669, 72d Cong., 1st Sess., 9 (1932).

The injunction is vacated and the case is remanded for dismissal of the complaint.