MISSOURI–KANSAS–TEXAS R. CO. et al.
v. RANDOLPH et al. (two cases).
WOOD et al. v. RANDOLPH et al.
Nos. 13564–13566.

Circuit Court of Appeals, Eighth Circuit.
Nov. 5, 1947.

Rehearing Denied Dec. 17, 1947.

M. E. Clinton, of Dallas, Tex.(C. S. Burg and Carl S. Hoffman, both of St. Louis, Mo., G. H. Penland and M. E. Clinton, both of Dallas, Tex., and Ellison A. Neel, of Kansas City, Mo., on the brief), for appellants Missouri-Kansas-Texas R. Co., a Missouri corporation, and Missouri-Kansas-Texas R. Co. of Texas.

John Murphy, of Kansas City, Mo. (W. A. Endle, Gen. Counsel, Brotherhood of Railroad Trainmen, of Cleveland, Ohio, and R. Carter Tucker, William H. Wilson, J. Gordon Siddens, and Tucker, Murphy & Wilson, all of Kansas City, Mo., on the brief), for appellants R. D. Wood et al.

Clyde Taylor, of Kansas City, Mo. (Clif Langsdale, of Kansas City, Mo., on the brief), for appellees.

Before GARDNER, WOODROUGH, and RIDDICK, Circuit Judges.

WOODROUGH, Circuit Judge.

These appeals come before us on one record from an interlocutory order of temporary injunction entered after trial of the issues presented by the application for temporary injunction in a class action presenting diversity of citizenship and requisite amount involved, in which the passenger train porters working on the lines of the two above named railroads through their labor unions and union officials as plaintiffs invoked the jurisdiction of the court to preserve to them by injunction the performance of certain enumerated items of passenger train operating work on the lines of the two railroads, which work they had been doing for a long time and were doing at the time of the order, and which they claimed the right to perform by virtue of their collectively bargained contract with the railroads. The trainmen working for the railroads on the passenger trains on the lines, acting through their labor unions and union officers, were claiming the right to do the work in question by virtue of their collectively bargained contract with the railroads, and were demanding the work from the railroads and filing claims and threatening to file further claims against the railroad for pay for that work when the work is denied them and train porters or others are permitted to do it.[1] The railroads were about to accede to the

---

[1] The items of work in dispute are:

1. Inspect cars and trains and test signal and brake apparatus for the safety of train movements, as per Carrier's rules.

2. Use hand and lamp signals for the protection and movement of trains and engines, including the necessary flag protection on the head end of trains, or through block.

demands of the trainmen and intended, after due notice and in accord with the provisions of the Railway Labor Act, 45 U.S.C.A. § 152, Seventh and § 156, to cancel the contract with the train porters on which the train porters based their claim of right to do the specific items of train operating work and to negotiate a new contract excluding such items. The temporary injunction undertakes to maintain the previously existing status of the passenger train porters in their performance of the work in question by declaring that their collectively bargained contract with the railroads of December 3, 1928, "provided for and vouchsafed" the work in question to them; by enjoining the railroads from disturbing the status of the plaintiffs under said contract; and by enjoining the Brotherhood of Railroad Trainmen and all the members thereof working for the two railroads from seeking to enforce their demands by claims and suits against the railroad companies, and by enjoining them from interfering in any manner whatever with the contractual relations (as declared by the court) between the porters and the companies by inducing or coercing the companies to cancel or abrogate them.

The appellant representatives of the railroad trainmen contend in this court, as they did in the court below, that the facts pleaded as well as the facts shown in evidence in this case, disclose that the controversy presented is a jurisdictional labor dispute within the purview of the Railway Labor Act, 45 U.S.C.A. § 151 et seq., and a labor dispute within the meaning of the Norris-LaGuardia Act, 29 U.S.C.A. § 101 et seq., and that the District court should not have undertaken to interpret the agreements of the passenger train porters or of the railroad trainmen with the railroads for the purpose of settling by injunctional orders or decree, the dispute as to whether one or both of the two classes of employees, the train porters and the trainmen, should perform the work in question. They contend that the court should have stayed exercise of its power to issue injunctional orders and should have relegated the parties to the tribunals specifically provided by Congress in the Railway Labor Act for mediation and for determining the interpretation and application of collective bargaining contracts such as are shown to be involved in this case, in order to finally settle the labor dispute arising out of them, and that the issuance of the temporary injunction in the first instance was erroneous.

Our study of the record, including the stipulation of facts and the evidence, convinces that these contentions are fully sustained, and that the issuance of the temporary injunction was erroneous in view of the statutes and the decision of the Supreme Court in Order of Railway Conductors v. Pitney, 326 U.S. 561, 66 S.Ct. 322, 325, 90 L.Ed. 318.

In that case, as in this, it was sought to have the court adjudicate and settle through injunctive process, jurisdictional labor disputes involving the claims of two groups of employees of the railroad, each claiming the right by virtue of its respective collective bargaining agreement with the railroad, to do certain items of railroad work. The court observed that "interpretation of these contracts involves more than the mere construction of a 'document' in terms of the ordinary meaning of words and their position. * * * For O. R. C.'s [Order

---

3. Open and close switches and derails for switching and for the movement of trains and engines en route; around wyes; and at some terminals.

4. Couple and uncouple cars and engines and the hose and chain attachments thereof, both en route and at some passenger terminals.

5. Pick up, set out, place and switch loaded and unoccupied passenger cars en route and at some passenger terminals.

6. Read the conductor's train orders and familiarize himself with them to determine where opposing trains are to be met or passed, and observe position of all train order signals and see that train orders affecting the movement of trains are picked up en route.

The porters do not perform or claim the right to do all of such work required on passenger train runs. They perform and help members of other groups to perform short tasks that come within the description, in addition to doing the work that takes most of their time which is extraneous to train operation.

of Railroad Conductors] agreements with the railroad must be read in the light of others between the railroad and B. R. T. [Brotherhood of Railroad Trainmen]. And since all parties seek to support their particular interpretation of these agreements by evidence as to usage, practice and custom that too must be taken into account and properly understood. The factual question is intricate and technical. An agency especially competent and specifically designated to deal with it has been created by Congress. Under these circumstances the court should exercise equitable discretion to give that agency the first opportunity to pass on the issue. Certainly the extraordinary relief of an injunction should be withheld, at least, until then. * * * Only after the Adjustment Board acts, but not until then, can it plainly appear that such relief is necessary to insure compliance with the statute. Until such time, O. R. C. can not show irreparable loss and inadequacy of the legal remedy. The court of equity should, therefore, in the exercise of its discretion stay its hand."

So in this case, neither the agreement between the railroad companies and the train porters, nor that between the railroad trainmen and the railroads, states in so many words that the railroads agree to give the work in question to either of the groups or both. Each of the parties resorts to usage, practice, custom and argumentation to support its particular interpretation and claim, and in the several instances in which the real dispute here involved, whether train porters should be permitted to perform the items of work in question or whether railroad trainmen have the exclusive right, has been submitted to the Adjustment Board for determination and award by contesting parties, the reports of the proceedings show the citation and consideration by the Board of scores of prior awards of the Board of asserted relevancy.[2] The most relied on provision of the train porters' contract is that "train porters when on duty will be under the jurisdiction of the conductor and will perform such duties as may be required," and it is argued that the wording, considered in the light of the work the porters have done over the long period of years and were doing at the time of the injunction, and the fact that they individually signed agreements that they would perform such duties as might be assigned to them, proves the contract claimed for the porters. The trainmen, on the other hand, rely on many provisions of their contract which they say establish a classification of brakemen and mutually obligate the railroads to assign to the brakemen, and the brakemen to perform, a certain class of work, including all of that in dispute. They argue that as their contract contains no limitation to less than all of their work of brakemen on the passenger trains, it must be construed to contemplate all of such work on such trains of the railroads. The question of interpretation and application of the labor contracts here is of the same intricacy and calls for the same special familiarity with railroad work and labor relations as in the Conductors' case, supra.

The plaintiffs in this case have attempted to escape the impact of the statutes limiting the issuance of injunctions to settle labor disputes without resort to administrative process by casting their bill of complaint in the form of an action to enjoin a common law tort. They charge the trainmen with wrongful conduct amounting to tort, committed and threatened against the railroads to compel the railroads to breach or cancel their contracts with the porters, and have argued that the injunction sought on that ground is not within the purview of the federal Acts. But examination of the

[2] See i. a.,
Award No. 5907, Docket No. 9899. Brotherhood of Railroad Trainmen—Southern Pacific Lines in Texas and Louisiana.

Award No. 7251, Docket No. 14777. Brotherhood of Railroad Trainmen—The Texas and Pacific Railway Company.

Award No. 6640, Docket No. 7400. Brotherhood of Railroad Trainmen—

The Atchison, Topeka and Santa Fe Railway Company—Eastern and Western Lines.

Award No. 5906, Docket 9898. Brotherhood of Railroad Trainmen—Southern Pacific Lines in Texas and Louisiana.

Award No. 5906, Docket No. 9898. Brotherhood of Railroad Trainmen—Missouri-Kansas-Texas Railroad Company.

record convinces that there was no substantial evidence tending to show that the defendant trainmen have committed or threatened any such actionable tort. They have asserted a right under their contract to do certain work of the railroads, and they have taken the traditional course of persons claiming under a contract of employment of requesting the work and holding themselves ready, willing and able to perform it, and demanding the agreed pay on being denied opportunity. Their demands and declaration of intention to claim pay are directed solely to the enforcement against the railroads of their own claim of exclusive right under their own contract. An alternative course open to them was to call a strike. The course they have adopted is clearly within the purview of the Railway Labor Act which provides for determination by the Adjustment Board of the demands for the pay which result from it. There is, of course, implicit in the demands the trainmen made upon the railroads for the work in question, that others now doing it shall discontinue its performance, just as the demands of the porters that the railroads let them do the part they are doing imply that trainmen be to that extent excluded. The conflicting demands upon the railroads constitute and formulate the labor dispute which the Acts intend shall be settled where possible through the administrative procedure without the issuance of injunction (at least in the first instance) against either of the parties involved. To declare that a labor union's resort or threat to resort to administrative processes of mediation and adjustment by expert agencies especially set up and established by Congress for settlement of its labor disputes constitutes an enjoinable tort would completely defeat the intent of Congress as clearly shown in the Acts. We find no controversy is presented here except the labor dispute, the settlement of which is clearly within the purview of the Acts and may not be accomplished by injunction in the first instance.

■ A further contention for the porters is that the Railway Labor Act does not afford them adequate administrative remedy to preserve their claimed right to do the work in question and be compensated therefor because the Mediation and Adjustment Boards provided for in the Railway Labor Act are made up in part of persons chosen by labor unions in which the porters, who are colored men, are not eligible for membership. But there is nothing in the record to indicate that racial consideration has anything to do with this labor dispute. The provisions of the Act assure that the Boards shall be evenly balanced in membership between management and labor whose conflicts of interests give rise to and engage the exercise of the jurisdiction, always in full view of the fact that unless they work together the railroad industry will not work at all. In the situation here presented, any possible interest to get the work in dispute for white union members is offset and in conflict with the obvious interest of management to have satisfactory men on the passenger trains who are unrestricted by the craft classifications and who for less pay are ready, willing and able to do short tasks along the run—"such tasks as may be required," "such duties as may be assigned," in addition to their other work that takes up most of their time. There is no reason to anticipate unfairness to colored porters on account of their color by reason of the constitution of the Boards.

■ It is also argued for the porters that inadequacy of administrative remedy results to them because they cannot take their claims to the same Adjustment Board which has jurisdiction over the claims of the trainmen. But the complete answer is that their claims are claims against the railroads. Insofar as the railroads propose to terminate the existing contract with the porters and to change their working conditions, the statute gives the porters the right to resort to the Mediation Board, 45 U.S.C.A. § 155, and that Board is required to use its best efforts to bring about an amicable settlement, 45 U.S.C.A. § 152. The railroads are required to exert every reasonable effort to maintain agreements concerning working conditions and to settle all disputes in order to avoid interruption to commerce, 45 U.S.C.A. § 152, First. The abstract question whether there are some things in the operation of a train

which a porter working on it ought to be allowed to do, instead of transporting and paying a brakeman to idle during a whole run except for the few minutes that it takes to do the short tasks involved, suggests a field for discussion to a layman and a wider one to the expert. It appears unlikely that a full application of good faith, common sense, mediation and adjustment will ultimately produce an absolute negative. In each of the awards to which reference has been made a qualification at least as to emergencies was preserved by the Adjustment Board, and none of the awards is claimed to be res adjudicata as to the parties in this or other cases. The railroad industry is not static and the machinery for reconciliation of differences among those who carry it on is adapted to meet the problems as they arise from day to day in localities, on different roads and under varying conditions. But in the first instance the courts may not fix and preserve a set status by enjoining the railroads from making a change in their contracts with the porters and the trainmen from resorting to the administrative processes Congress has provided to meet such situations and prevent interruption of commerce.

The railroad companies present two appeals, No. 13,564 and No. 13,565, complaining of the issuance of the temporary injunction against them and of its form and of the terms upon which it was conditioned. They contend it should be dissolved. Their arguments and briefs are illuminative and have been considered. But the temporary injunction, insofar as it runs against the railroads, was induced solely by the court's conclusion that the trainmen were guilty of past and threatened tortious conduct, wrongfully coercing the railroads into their proposed action, which it considered enjoinable. It is clear from the record that no injunction would have been issued against the railroads except upon that consideration and such was the theory of the plaintiffs' case as against the railroads. The legal right of the railroads to proceed as they have done and intend to do in respect to their contract with the train porters, is clearly accorded them in the statute, 45 U.S.C.A. § 152, Seventh, and cannot be questioned. Our conclusion that there was

no tortious conduct on the part of the trainmen justifying the temporary injunction against them therefore necessitates that it be dissolved as to the railroads as prayed in their appeal.

We concluded that the case must be remanded with direction to dissolve the temporary injunction and for further proceedings in accord with this opinion. It is so ordered.