**BROTHERHOOD OF RAILROAD TRAINMEN, LOCAL LODGE NO. 721, et al., Appellants,**

v.

**CENTRAL OF GEORGIA RAILWAY COMPANY, Appellee.**

**No. 15671.**

United States Court of Appeals
Fifth Circuit.

Feb. 10, 1956.

Rehearing Denied April 2, 1956.

Benning M. Grice, Macon, Ga., Wayland K. Sullivan, Asst. Gen. Counsel Brotherhood of Railroad Trainmen, Cleveland, Ohio, for appellant.

John B. Miller, Savannah, Ga., for appellee.

Before HUTCHESON, Chief Judge, and BORAH and BROWN, Circuit Judges.

HUTCHESON, Chief Judge.

Brought by their employer in the midst of a labor dispute, against the named defendants and the class of employees represented by them, the suit was for: (1) a temporary injunction restraining them pendente lite, from endeavoring by self help to effect a modification or change of an arbitration award known as the Cheney Award and from calling and putting into effect a strike because of plaintiff's refusal to acquiesce in their demands; (2) a judgment declaring the award final and binding and not subject to modification and change; and (3) a final order making the injunction permanent.

The claim was: that, though in compliance with the decision of the Supreme Court of Georgia,[1] that it should do so, and pursuant to the Railway Labor Act, 45 U.S.C.A. § 151 et seq., plaintiff had submitted the controversy between it and the defendants over the Cheney Award to the National Railroad Adjustment Board, the defendants had demanded that a modification of the award be negotiated and had given formal notice that a strike of the employees was being set subject to a satisfactory settlement; that the strike date was once postponed at the intervention of the National Mediation Board, but the mediator had advised plaintiff that his services were fruitless; that the defendants will not agree to leave the matter in status quo pending a decision of the controversy by the National Adjustment Board, and have called a system wide strike against plaintiff to coerce it to adopt defendants' interpretation of the award; and that if the strike becomes effective it will completely close down plaintiff's operations with resulting irreparable injury.

The defendants filed a motion to dismiss[2] for want of jurisdiction on the ground, among others, that the petition shows on its face that plaintiff is seek-

1. Central of Georgia Ry. Co. v. Brotherhood of Railroad Trainmen, 211 Ga. 263, 85 S.E.2d 413.

2. "Now comes the Brotherhood of Railroad Trainmen, et al, defendants in the above entitled cause, and moves the court as follows:

"1. To dismiss the action because the petition fails to state a claim against the defendants upon which relief can be granted.

"2. To dismiss the action because the petition shows on its face that the Court

ing an injunction in the face of, and contrary to, the Norris-LaGuardia Act, Secs. 101–115, Title 29.

This motion denied and a hearing had, the district judge concluding: that the Norris-LaGuardia Act was not intended by Congress to deprive a district court of jurisdiction to prevent irreparable injury by maintaining the status quo in respect to a controversy which is pending before the National Adjustment Board; and that it was necessary to preserve the status of the controversy now before the Board; granted the preliminary injunction as prayed, enjoining defendants from striking, work stoppage, picketing, or any similar device.

Appealing from the order denying its motion to dismiss, for want of jurisdiction, and the order granting the injunction, appellants, presenting four questions[3] for our decision, thus summarize their principal argument for reversal:

"In both the overruling of the motion to dismiss the carrier's complaint and in issuing the temporary injunction against the Brotherhood defendants, the trial court violated the Norris-LaGuardia Act. These violations were numerous, repeated and substantial. Duty and candor compel us to say they were also flagrant. Any one of those violations controls and should alone decide the case. Therefore, we shall treat this feature first, before taking up the additional reasons for reversal."

"The policy of the Act as set forth in Section 102 prevades all of its provisions. It was passed primarily to protect labor, not management. By doing so, it was hoped that all industry, labor and management, would be benefited ultimately and thus that the Act would be in the public interest."

■ We agree with the appellants that this is so. In the Carter case, Carter v. Herrin Motor Freight Lines, 5 Cir., 131 F.2d 557, 560, where the suit was for an injunction, the court upheld the injunction as to those acts which dealt with such violations as trespassing, injuring property, intimidating, or threatening customers, molesting, assaulting, or intimidating employees, but reversed the injunction in respect of all matters which could be construed as prohibiting acts which the statute allows. Saying:

"The language of the act is too plain and the decisions construing it too clear cut and positive to admit of any doubt that the purpose and effect of the act, as a whole, was to give expression to, and make effective, the policy which breathes throughout it. This policy is that labor disputes, as such, with the assembling, the picketing, the persuasion, the stopping of work, the enlisting of sympathy and support, and all the other acts expressly enumerated in Sec. 104, were no longer to be the subject of injunctive action but were, and were expressly recognized to be, legitimate means for advancing the interests of the

is without jurisdiction of the subject matter.

"3. To dismiss the action on the grounds that the Court lacks jurisdiction because the petition shows that the plaintiff has not exhausted its administrative remedy.

"4. The petition shows upon its face that plaintiff is seeking an injunction under circumstances that are prohibited by the laws of the United States, to-wit, the Norris LaGuardia Act, Title 29, Sections 101–115 and seeks no other relief."

3. These are:

"First. Were all of the requirements of the Norris-LaGuardia Act met so as to authorize an injunction under the facts here involved?

"Second. Did the railway carrier first exhaust its administrative remedies available under the Railway Labor Act so as to authorize an injunction under the facts here involved?

"Third. Is a demand for a change in rates of pay, rules or working conditions, pursuant to the Railway Labor Act, Sec. 6, a justiciable issue and basis for an injunction under the facts here involved?

"Fourth. Did the arbitration award in question conclude and thus prevent negotiation of the demand given by the Brotherhood to the Carrier pursuant to

working man, and, therefore, of the people as a whole. In the light of that policy, which can be made fully effective only when there is a recognition on the part of employer and employee alike that labor disputes as such are not at all reprobated but encouraged, and only violence in connection with them is forbidden * * *."

the court went on to hold that the use of injunctions in labor disputes, except for the limited purpose of preventing injury from violence where there was really no adequate remedy at law, was an abuse of legal process.

■ In the face of the imperative language of the section,[4] appellee's contention, that the act is not applicable because what was sought to be enjoined was action in breach of a contract embodied in the Cheney Award, is wholly untenable. The same contention has been rejected in case after case holding that the statute requires a contrary ruling.

■ Nor may appellee find better support for the injunction in its claim that the purpose of the strike and its effect would be to do violence to statutory procedures embodied in the statute for a disposition of controversies by the Railroad Adjustment Board. For, as has been held time and again, the purpose of the strike, whether it is or is not illegal, is not a limitation upon the prohibitions of the statute. Cf. Wilson & Co. v. Birl, 3 Cir., 105 F.2d 948, and East Texas Motor Freight Lines v. International Broth. of Teamsters, 5 Cir.,

163 F.2d 10, where this court held that such a contention was an attempt to enlarge Federal Court jurisdiction as limited by the act. Cf. also Milk Wagon Drivers' Union, etc. v. Lake Valley Farm Products, 311 U.S. 91, 61 S.Ct. 122, 85 L.Ed. 63, and 43 C.J.S., Injunctions, § 147, p. 748 and 29 A.L.R.2d 360.

■ In this view it is not necessary for us to determine whether, as contended by appellees, the strike, if called, would be violative of the Railway Labor Act, upon the theory either that it would violate the contract providing for the Cheney Award, or that it would violate the spirit and purpose of the Labor Act to conduct a strike while the issue which brought it about was pending before the Adjustment Board with jurisdiction to decide it. This is so because the fundamental weakness of appellee's position is that there is no express provision in the Labor Act in any way limiting the scope and operation of the prohibitions of the LaGuardia Act, and the claim of implied repeal because of a necessary conflict between the two acts is not borne out by a consideration of the language of the two acts either apart from or in connection with their legislative history.

It is true that the Railway Labor Act does contemplate that every reasonable effort will be made to maintain agreements and to avoid interruption to commerce, and that it contemplates that disputes be considered, and, if possible, decided expeditiously by negotiation and that if disputes over grievances are not adjusted on the property, they may be referred by both or either of the parties to the Adjustment Board. It is equally

the Railway Labor Act, for compensation for coupling so as to authorize an injunction under the facts here involved?"

4. "No court of the United States shall have jurisdiction to issue any restraining order or temporary or permanent injunction in any case involving or growing out of any labor dispute to prohibit any person or persons participating or interested in such dispute (as these terms are herein defined) from doing, whether singly or in concert, any of the following acts: (a) Ceasing or refusing to perform any work or to remain

in any relation of employment; " (d) Aiding any persons involved in any labor dispute; (e) Giving publicity of any labor dispute; (f) Assembling to promote their interests; (g) Advising as to any of the acts heretofore specified; and (h) Agreeing with others to do or not to do any of the acts heretofore specified and (i) Causing or inducing without fraud or violence the acts heretofore specified, regardless of any such undertaking or promise as is described in Sec. 103. 29 U.S.C.A. § 104.

true, however, that none of the sections mandatorily provide that disputes must be submitted to the board rather than being handled by the voluntary methods provided for in the same act.

If, as appellee contends, Congress had, shortly after the passage of the Norris-LaGuardia Act, intended to curtail its provisions, limiting the equity jurisdiction of the courts in labor disputes so as to subject strike action to injunction, it is inconceivable, we think, that it would not have expressly so provided. Indeed, in General Committee of Adjustment, etc. v. Missouri-Kansas-Texas R. Co., 320 U.S. 323, 64 S.Ct. 146, 88 L.Ed. 76, the Supreme Court expressly held that the Mediation Board's determination of such a controversy was not justiciable. In the light of that decision, appellee is under a burden too heavy to be borne when it seeks to justify the judicial remedy sought and obtained here by invoking a jurisdiction which the Norris-LaGuardia Act expressly withdraws from the Federal Courts.

In short, all that is for decision on this appeal is whether the Railway Labor Act has expressly or impliedly repealed the provisions of the LaGuardia Act, denying jurisdiction to courts to enjoin strikes or work stoppages. Unless, therefore, it can be found that there has been such repeal, it is wholly unnecessary to determine whether, as appellee claims, the adjustment board has jurisdiction over the dispute or, as appellants claim, it does not have. Equally immaterial is the question whether the issue before the Adjustment Board is the same as that involved in the present case.

█ Further, appellee's contention, which prevailed with the district judge below and which it presses here, that the suit falls within the language of the LaGuardia Act making an exception to the grant of an injunction in situations where unlawful acts have been threatened and will be committed unless restrained, is wholly untenable. It is plain from the language and the context that the words "unlawful acts" mean violence, breaches of the peace, criminal acts, etc., and that such terms do not include, they do not constitute a general reference to, anything that may be considered illegal but apply specifically to the acts of violence which authority is calculated to control. Wilson & Co. v. Birl and Carter v. Herrin Motor Freight Lines, supra. Cf. 43 C.J.S., Injunctions, § 138, p. 702 and cases cited.

The complaint did not allege that any such violence was threatened or feared, indeed it was carefully framed with the purpose and intent, if possible, to plead a case not within but without the Norris-LaGuardia Act. The statement of the district judge in Finding 33, with reference to the degree of damage depending on the destruction and violence of the strike, and in Finding 34, with reference to the carrier's being threatened with unlawful acts by the defendants which would result in damage to its property, did not constitute findings that physical violence had been threatened and would be committed, and, if they were intended to be such, they are without any support either in the pleadings or in the evidence. Neither was there allegation or supporting proof that police officers were unable or unwilling to furnish adequate protection.

In view of these conclusions, it is unnecessary for us to consider the points made by appellants that the carrier's own conduct in failing (1) to sincerely negotiate, (2) to apply for mediation, and (3) after mediation had begun to proceed with it, and (4) to exhaust its remedies before the Adjustment Board before resorting to suit, was such as to preclude it, under Section 108 of the Act, from seeking an injunction.

Finally, because of our expressed views that this case is one arising under the Norris-LaGuardia Act and the district court was without jurisdiction to proceed in it, we do not reach the last question dealt with in appellants' brief, whether the fault in respect of the Cheney Award was the carrier's rather than the employees'.

Appellee concedes that the basic and principal question on this appeal is whether or not the Norris-LaGuardia Act prohibits the district court in this case from taking jurisdiction and granting the pendente lite relief prayed. Conceding, too, that this is a case of first impression in any United States Court of Appeals, it urges upon us that the nature of the relief asked differentiates this case from all others and takes it out of the provisions of the Norris-La-Guardia Act, limiting the jurisdiction of the district court and directing its exercise. In emphasis of this argument, the appellee insists that it did not seek to have the dispute in question settled by the district court, that it sought merely to maintain the status quo pending the decision of the question by the Adjustment Board.

Assuming that this is a correct statement of its pleadings, and treating its argument as directed to the fact that the injunctive action granted was limited, we think it plain that this makes no difference. The decisive, the fundamental questions here are, was this a labor dispute and did the suit seek to prevent by injunction what the act denies the court the power to prevent, and the answers to the questions must be in the affirmative.

The judgment is, therefore, reversed, and the cause is remanded with directions to dismiss the suit for want of jurisdiction.

BROWN, Circuit Judge (dissenting).

The Railroad, by complaint,[1] sought and the court granted an injunction[2] against the threatened, imminent strike

---

1. The majority opinion states that the suit was for "(2) a judgment declaring the award final and binding and not subject to modification and change; * *." With deference I do not so construe the record. In paragraph 30 of the complaint, the injunction sought is carefully restricted to "pending a determination of this controversy by the National Railroad Adjustment Board" and in the Prayer, that an injunction be issued restraining Brotherhood from "endeavoring to negotiate or * * * demanding a rule * * * prescribing extra compensation * * * for coupling and uncoupling air, steam or signal hose; * * from calling a strike, work stoppage * * * directly or indirectly * * * because of * * * any feature of the controversy * * * described which has been referred to the National Railroad Adjustment Board * * * from endeavoring to negotiate a cancellation, change, modification or revision of the Award of Referee George Cheney * * until the consideration of this controversy by the machinery of the National Railroad Adjustment Board has been exhausted in accordance with the provisions of the Railway Labor Act * *." The Brotherhood's brief before us described the complaint and Prayer, (page 2). "It prayed for temporary restraining order, temporary injunction, and permanent injunction, enjoining a threatened strike because of attempts by the Brotherhood to re-negotiate for pay for coupling."

2. The Decree carefully recites the purpose to be: "in order to preserve the status quo of the controversy now before the National Railroad Adjustment Board, * *:
"Pending further order * * *. and *. * * a final hearing * * * the [Brotherhood] and others * * * are * * * enjoined * * * from threatening to or from calling a strike, work stoppage, or picketing * * * or from using any similar device * * * against the * * * Railway Company, and from striking, stoppage of work, picketing * * * in an effort to or designed or intended:
"A. To compel [Railroad] to agree with [Brotherhood] to a cancellation, modification, change or revision of the * * * Cheney [Award] * * *; or
"B. To compel the [Railroad] to agree to or to consummate a rule * * inconsistent with the Cheney Award * * *; or
"C. To compel [Railroad] to agree to or to consummate a contract * * * prescribing extra compensation * * * for uncoupling air, steam * * * hose * * * inconsistent with the * * * Cheney Award.
    *    *    *    *    *
"This order is not to be construed as effecting any action of the [Brotherhood] in any particular, except as actions may involve the controversy now before the National Railroad Adjustment Board; and is also not to be construed as inhibiting a voluntary settlement of this dispute."

by the Brotherhood pending the determination by the Railway Adjustment Board of the question submitted to it by the Railway of whether the Cheney Award decided "once and for all" the question of whose duty was the job of coupling and uncoupling steam and air hose, as claimed by the Railroad, or, as claimed by Brotherhood, was temporary in nature and open for negotiation.[3] No declaratory relief or interpretation of the Cheney Award was sought or obtained.

At the outset, I am in complete agreement that, if the Norris-LaGuardia Act, 29 U.S.C.A. §§ 101–115, applies, the Railroad has not met its terms and the injunction, even though limited, ought not to have been granted. Similarly, I concur that the mere fact that the strike involved some violation of law or is in breach of contract does not remove the controversy from the sweeping prohibition of that Act. Wilson & Co. v. Birl, 3 Cir., 105 F.2d 948; East Texas Motor Freight Lines v. International Broth. of Teamsters, 5 Cir., 163 F.2d 10; Carter v. Herrin Motor Freight Lines, 5 Cir., 131 F.2d 557; Milk Wagon Drivers' Union, etc. v. Lake Valley Farm Products, 311 U.S. 91, 61 S.Ct. 122, 85 L.Ed. 63.

But here injunction was sought and granted not because the contract forbade a strike, or to negotiate with the pressure of threatened strike was a violation of the contract, but rather because the contention and countercontention of the effect and significance of the contract (Cheney Award) was itself a "dispute[s] between an employee or group of employees and a carrier * * * growing out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions * * * ", 45 U.S.C.A. § 153, First (i), the determination of which is committed exclusively, where voluntary negotiations fail as they did here, to the National Railroad Adjust-

---

3. The Cheney Award, seeking to resolve the provocative controversy raging since 1887 with the advent of the Westinghouse Air Brake, grew out of the impasse in the 1950 Railway-Brotherhood negotiations with its threat of a nationwide strike of all Class I Railroads with the devastating consequences to the nation's economy and security. The Mediation Board, under the Railway Labor Act, attempted unsuccessfully to produce agreement or persuade the parties to arbitrate. Under the Act, the President of the United States appointed an Emergency Board whose findings the Brotherhoods declined to accept, requesting instead that the President take control of the Railroads. In December 1950, after extended Presidentially sponsored conferences, agreement was reached on all but a limited number of issues, then specified, including coupling of steam-air hoses. On May 25, 1951, all issues except two were settled, one being coupling air hoses, and on that date the parties agreed to submit the issues to a Presidentially appointed Referee, (George Cheney was named) "the decision of the Referee shall be final and binding on the parties, and shall become effective * *."

On November 28, 1953, the Brotherhood, under 45 U.S.C.A. § 156 made demand for contract changes, including pay increases for air-steam coupling. Threatened with strike over the issue and mediation failing, the Railroad filed in the Georgia State Court a suit for declaratory judgment under the Cheney Award declaring it final and binding and seeking injunction to effectuate it. The Railroad asserted below that Brotherhood contended, and the Supreme Court of Georgia agreed, that the State "Court is without jurisdiction * * * and * * * the matters involved are within the jurisdiction of the National Railroad Adjustment Board exclusively under Title 45, § 153 [First] (i) * * *." Central of Georgia Ry. Co. v. Brotherhood of Railroad Trainmen, 211 Ga. 263, 85 S.E. 2d 413, 414. Immediately, the Railroad submitted the controversy to the Railroad Adjustment Board. Then followed, in January and February 1955, the renewed demands for negotiation by the Brotherhood, the strike notices, efforts at mediation and submission to arbitration. The Railroad claimed, and the trial court found, that the Brotherhood was unwilling to allow the question of the extent, nature and effectiveness of the Cheney Award to be decided by the Railroad Adjustment Board and, a system-wide strike being imminent, an injunction was issued to permit it to be determined by the Adjustment Board.

ment Board. And if the controversy was one for the Railroad Adjustment Board, then the refusal of the Brotherhood, and its members, to allow the statutory course to be followed, and its interference in that process by a system-wide strike designed to force the issue on the very controversy before that tribunal, became, not a mere violation of a general law (unavailable as an escape from Norris-LaGuardia), but an absolute violation of the very law designed to regulate and control labor controversies of the kind involved.

Ignoring this latter point with an undue preoccupation with artificial concepts of partial repeal or implied repeal of Norris-LaGuardia is, I think, the defect of the majority opinion. The question is not: which repeals the other, and to what extent? It is rather the problem of frequent necessity in adjudication where two or more statutes, each bespeaking its own major policy, are accommodated and adapted to assure that the total policy reflected by all is effectuated.

This approach, substantiated by abundant authorities, has special merit here. Both statutes are the offspring of a common era, enacted (1932 and 1934) near the same time, with each intended as a major, deliberate and far-reaching change in national labor policy. Neither was intended as the repeal of the other. The enactment of one was not the repudiation of the policy of the other. They exist side by side and where, through the years, they have come into apparent collision, the courts, unfettered by awkward concepts of repeal, have found the way by which now one, now the other, has been found dominant and controlling.

In this light, Federal Courts have never been shackled by Norris-LaGuardia in giving life and force to the mandates of the Railway Labor Act. Virginian R. Co. v. System Federation; [4] Graham v. Brotherhood of Locomotive Firemen and Enginemen.[5]

---

4. 300 U.S. 515, 57 S.Ct. 592, 607, 81 L. Ed. 789; injunction issued to require Railroad to bargain with Union certified by Mediation Board and not to bargain with another; notwithstanding that this controversy met many of the Norris-LaGuardia definitions of a "labor dispute" and the decree issued was of a type forbidden by Section 104, the Supreme Court rejected it as a bar: "It suffices to say that the Norris-LaGuardia Act can affect the present decree only so far as its provisions are found not to conflict with those of section 2, Ninth, of the Railway Labor Act (45 U.S.C.A. § 152, subd. 9), authorizing the relief which has been granted. Such provisions cannot be rendered nugatory by the earlier and more general provisions of the Norris-LaGuardia Act." Of course, Section 2, Ninth, 45 U.S.C.A. § 152, Ninth, does not, as such, authorize injunctions.

5. 338 U.S. 232, 240, 70 S.Ct. 14, 17, 94 L.Ed. 22; injunction affirmed against a union forbidding unlawful discrimination toward non-members. "The respondent [Brotherhood] has strenuously urged throughout that in view of the provisions of the Norris-LaGuardia Act * * * the District Court was without jurisdiction to grant relief by injunction. * * But this is not a question of first im-

pression. In Virginian R. Co. v. System Federation, 300 U.S. 515, 57 S.Ct. 592, 81 L.Ed. 789, we held that the Norris-LaGuardia Act did not deprive federal courts of jurisdiction to compel compliance with positive mandates of the Railway Labor Act, 45 U.S.C.A. § 151 et seq., * * * enacted for the benefit and protection within a particular field, of the same groups whose rights are preserved by the Norris-LaGuardia Act. * * * We adhere to the views expressed in the Virginian case. But the Brotherhood urges that the controversy in the Virginian case did not involve a labor dispute within the meaning of the Norris-LaGuardia Act and that accordingly that case must be distinguished on its facts. * * * We do not accept the Brotherhood's invitation to narrow the meaning of that term. * * * Moreover, if this Court had considered that a labor dispute was not involved, it would hardly have taken the trouble, in the Virginian case, to refute contentions based upon parts of the Act, which as a whole extends its protection solely to such disputes. * * * If, in spite of the Virginian, Steele [Steele v. Louisville & Nashville R. Co., 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173], and Tunstall [Tunstall v. Brotherhood of Locomotives,

Of course, the Railway Labor Act is not a voluntary, free-will mechanism; it is one imposing substantial obligations on the parties, railway management and labor alike; and a court, by injunction, can compel the parties to carry out and effectuate its aims, Texas and N. O. R. Co. v. Brotherhood of Ry. & S. S. Clerks, 281 U.S. 548, 50 S.Ct. 427, 74 L.Ed. 1034; Virginian R. Co. v. System Federation, supra; Order of Ry. Conductors of America v. Pitney; [6] Elgin, Joliet & E. Ry. Co. v. Burley;[7] Brotherhood of R. R. Trainmen v. Howard,[8] including the resolution of disputes, grievances, and controversies through the administrative machinery of the Adjustment Board set up under the Act.[9]

etc., 323 U.S. 210, 65 S.Ct. 235, 89 L.Ed. 187] cases * * *, there remains any illusion that under the Norris-La Guardia Act the federal courts are powerless to enforce these rights, we dispel it now. * * * "

This completely dissipates, I think, the force of the argument of the majority: "If, as appellee contends, Congress had, shortly after the passage of the Norris-LaGuardia Act, intended to curtail its provisions, limiting the equity jurisdiction of the courts in labor disputes so as to subject strike action to injunction, it is inconceivable, we think, that it would not have expressly so provided, * * *." Of course, its emphasis on the prohibition of *strikes*, as such, ignores, as Justice Jackson pointed out, the wide character of controversies protected and *remedies forbidden*.

6. 326 U.S. 561, 66 S.Ct. 322, 325, 90 L.Ed. 318; dispute over assignment of work on certain trains; one union contending that by virtue of a contract, not negotiated pursuant to Section 6, 45 U.S.C.A. § 156, it was unlawfully given to another. Court recognizes that injunction can issue to compel compliance with the Act, including Section 6, but since question depends on the interpretation of the disputed contract, this was a matter for determination by the Adjustment Board. "Under these circumstances the court should exercise equitable discretion to give that agency the first opportunity to pass on the issue. Certainly the extraordinary relief of an injunction should be withheld, at least, until then. * * * Only after the Adjustment Board acts, but not until then, can it plainly appear that such relief is necessary to insure compliance with the statute. * * * "

7. 325 U.S. 711, 720, 721, 65 S.Ct. 1282, 1288, 89 L.Ed. 1886, 1893; the court rejects the contention that an Adjustment Board award amounts to nothing more than an advisory opinion. "The contention, founded upon language of the opinion in Moore v. Illinois Central R. Co., 312 U.S. 630, 61 S.Ct. 754, 85 L.Ed. 1089, regards the Act's entire scheme for the settlement of grievances as wholly conciliatory in character, involving no element of legal effectiveness, with the consequence that the parties are entirely free to accept or ignore the Board's decision.

"At the outset we put aside this broadest contention as inconsistent with the Act's terms, purposes and legislative history. The Moore case involved no question concerning the validity or the legal effectiveness of an award when rendered. Nor did it purport to determine that the Act creates no legal obligations through an award or otherwise. * * * both prior and later decisions here are wholly inconsistent with such a view of its effects * * * 12 * * *." Footnote 12 then states: "Thus, one of the statute's primary commands, judicially enforceable, is found in the repeated declaration of a duty upon all parties to a dispute to negotiate for its settlement. * * * [Citing cases.] This duty is not merely perfunctory. Good faith exhaustion of the possibility of agreement is required to fulfill it. * * * Brotherhood of Railroad Trainmen v. Toledo, P. & W. R. R., 321 U.S. 50, 56, 64 S.Ct. 413, 416, 88 L.Ed. 534 [538] * * *. At successive stages of the statutory procedure other duties are imposed. Cf. §§ 5, First (b), 6, 10."

8. 343 U.S. 768, 72 S.Ct. 1022, 1026, 96 L.Ed. 1283; "In fashioning its decree the District Court is left free to consider what provisions are necessary to afford these employees full protection from future discriminatory practices of the Brotherhood. However, in drawing its decree, the District Court must bear in mind that disputed questions of reclassification of the craft of 'train porters' are committed by the Railway Labor Act to the National Mediation Board."

9. Rolfes v. Dwellingham, 8 Cir., 198 F.2d 591, 593: injunction issued in case involving allocation of work between competing classification of employees, to remain in force pending determination by the National Railway Adjustment Board of the question of jurisdiction involved or for a reasonable time for the waiters

The national Railway Labor Act is not for labor alone. To be sure it benefits labor greatly, but its underlying purpose is to assure industrial peace in an important phase of our national economy. It is a double-track system; the trains run both ways simultaneously, and when equity can compel a Railroad to comply, Texas & N. O. R. Co. v. Brotherhood of Ry. & S. S. Clerks; Virginian R. Co. v. System Federation, supra, so,

too, may it compel obedience by unions, Brotherhood of R. R. Trainmen v. Howard; Graham v. Brotherhood of Locomotive Firemen and Enginemen, supra.

It seems equally plain that a genuine difference over the meaning and effect of a contract is a grievance which must be submitted to and decided by the Railway Adjustment Board, Slocum v. Delaware, L. & W. R. Co.; [10] Order of Ry. Con-

to invoke the jurisdiction of the Board. Equitable relief was granted " 'in aid of the administrative machinery provided for the adjustment of disputes in the Railway Labor Act' ", * * * and "limited its injunction strictly to the purpose of affording opportunity for the administrative Board to function as contemplated by the Act. * * * The Railway Labor Act contemplates that the Boards which it sets up shall function through process of mediation and interpretation of disputed contracts to minimize conflicts and interruptions of commerce. * * * When the action was found to be wrongful and violative of the provisions of the Act, it was the duty of the court, and it properly acted, to restore the plaintiffs to their position before the wrongful action was taken against them." Court expressly states that Graham, Virginian, Steele, and Tunstall are "equally conclusive that the Norris-LaGuardia Act does not deprive the federal courts of power to issue such an injunction * * in aid of the administrative Board and to preserve the right of the waiters-in-charge to resort to the administrative procedure provided by * * * the * * * Act."

Missouri-Kansas-Texas R. Co. v. Brotherhood of Railway & S. S. Clerks, 7 Cir., 188 F.2d 302: institution of suits by the Brotherhood to enforce awards on allocation of work between competing classifications enjoined, as awards illegal for want of notice.

Missouri-Kansas-Texas R. Co. v. National Railroad Adjustment Board, D.C. N.D.Ill., 128 F.Supp. 331: injunction issued against Brotherhood and Board to forbid efforts to enforce conflicting, contradictory awards made without adequate notice pending a determination of all of the cases consolidated by further award of the Board.

Brotherhood of R. R. Trainmen v. Templeton, 8 Cir., 181 F.2d 527, certiorari denied 340 U.S. 823, 71 S.Ct. 57, 95 L.Ed. 605, 643: injunction issued against Brotherhood to forbid enforcement of and practices under awards made without adequate notice on allocation of work between competing classifications.

Railway Employees' Cooperative Association v. Atlanta, B. & C. R. Co., D.C. Ga., 22 F.Supp. 510: injunction issued against Railroad prohibiting interference with union selection of bargaining representative pending decision by Railway Labor Board machinery.

Cf. Baltimore & O. R. Co. v. Chicago River & I. R. Co., 7 Cir., 170 F.2d 654, certiorari denied Brotherhood of R. Trainmen v. Baltimore & O. R. Co., 336 U.S. 944, 69 S.Ct. 811, 93 L.Ed. 1101; Missouri-Kansas-Texas R. Co. v. Randolph, 8 Cir., 164 F.2d 4.

Union Premier Food Stores v. Retail Food C. & M. Union, 3 Cir., 98 F.2d 821, reversed as moot 308 U.S. 526, 60 S.Ct. 376, 84 L.Ed. 445, presented substantially the same problem under the National Labor Relations Act; injunction was issued against a strike where, in a representation controversy, the employer was neutral and the matter was then awaiting decision by the National Labor Relations Board.

10. 339 U.S. 239, 70 S.Ct. 577, 579, 94 L. Ed. 795; referring to the Act's purpose to avoid interruption to Commerce, 45 U. S.C.A. § 151a, Court stated: " * * * This purpose extends both to disputes concerning the making of collective agreements and to grievances arising under existing agreements. [Cites Elgin case, supra.] The plan of the Act is to provide administrative methods for settling disputes before they reach acute stages that might be provocative of strikes. Carriers are therefore required to negotiate with bargaining representatives of the employees. [Cites Virginian, supra.] The Act also sets up machinery for conciliation, mediation, arbitration and adjustment of disputes, to be invoked if negotiations fail. * * * It was to prevent such friction that the

ductors of America v. Southern Ry. Co., 339 U.S. 255, 70 S.Ct. 585, 94 L.Ed. 811, once that procedure has been invoked by one of the parties.[11]

The legislative scheme for these matters to be first determined by the expertise of the Adjustment Board is completely frustrated if resort by either party to court or any other activity which prevents the free functioning of this machinery is permitted. Requiring the submission of these grievances to the Adjustment Board contemplates the exercise of deliberative judgment in the light of its special industrial experience.

No matter how informal the proceedings might be, or how strange to lawyers and judges the mechanism may function, the whole spirit is that the result is to be an informed judgment. That means that the adjustment machinery must be free to consider the controversy in the light of its inherent merits, free from extrinsic pressures. This deliberation, this exercise of judgment, cannot take place if either of the parties can marshal and deploy pressures and forces, economic or otherwise, which will interfere with or interrupt or, more likely make altogether unnecessary or futile the operation of this machine.

A strike, or the threat of a strike, is but one kind of interference with the orderly operation of this mandatory system. If, merely because the union might ultimately strike after a final award by Adjustment Board or decision of Mediation Board, a strike, or threat of strike, can be used initially to thwart consideration or determination it would make the whole procedure futile. Surely, in the establishment of this system, Congress expected that machinery constructed for the purpose of eliminating strikes should have adequate means to control or regulate the force or threat of such action until the statutory device should have had an opportunity to function.

This does not impinge upon the basic policies reflected in the Norris-LaGuardia Act or the elemental rights which seem to inhere in the right to strike. A court of equity is not being used, as was so often formerly the case, to upset the balance or imbalance of competing economic forces in order to give one party, rather than the other, weight or advantage in a private controversy between labor and management. Here a court of equity exerts its power to fulfill the predominant public interest in having provocative (but as here otherwise relatively insignificant) controversies determined by the public agency established by law for that very purpose. In this way the equity court, not ranging on the side of one against the other, adheres strictly to the position of impartial enforcement of law—an imposition on each and both of the duty to use freely, and in good faith exhaust, this statutory machinery for the determination of these controversies.

A real, genuine, spirited disagreement exists as to the meaning, application and effect of the Cheney Award—whether, as claimed by Railroad, it solved the air coupling problem forever, or, as contended by Brotherhood, foreclosed it only during the life of the 1950 contract of which the Cheney arbitration was a part, and, whether, in either case, it would prohibit efforts by the Brotherhood to secure changes in contracts concerning the future. If the Railroad is right, the Brotherhood should be held to the bargain made inducing the Cheney arbitra-

1926 Act provided for creation of various Adjustment Boards by voluntary agreements between carriers and workers. * * * But this voluntary machinery proved unsatisfactory, and in 1934 Congress, with the support of both unions and railroads, passed an amendment which directly created a national Adjustment Board * * *. The Act thus represents a considered effort on the part of Congress to provide effective and desirable administrative remedies for adjustment of railroad-employee disputes growing out of the interpretation of existing agreements. * * * "

11. Elgin, Joliet & E. Ry. Co. v. Burley, 325 U.S. 711, 727, 65 S.Ct. 1282, 1292, 89 L.Ed. 1886, 1896, "Each party to the dispute may submit it for decision, whether or not the other is willing * * *."

tion and award; if the Railroad is wrong, the Brotherhood should be free to negotiate with all the pressures and forces it can marshal.

That controversy is for determination by the machinery of the national Railway Labor Act. The decree permits the machine to work. It was right, in my judgment.

I therefore respectfully dissent.

Rehearing denied; BROWN, Circuit Judge, dissenting.